**Wilson Lee CLOW, Jr., Lynne Ann Clow, Plaintiffs–Appellants,**

v.

**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; Jack Kemp, Secretary of HUD, William Y. Nishimura, Regional Administrator, HUD, Defendants–Appellees.**

No. 90–35324.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 8, 1990.

Decided Nov. 5, 1991.

Howard L. Graham, Tacoma, Wash., for plaintiffs-appellants.

Charles Pinnell, Asst. U.S. Atty., Seattle, Wash., for defendants-appellees.

Before TANG, O'SCANNLAIN and LEAVY, Circuit Judges.

PER CURIAM:

The Clows defaulted on a federally insured home loan and applied for acceptance into the Department of Housing and Urban Development's mortgage assistance program. The Department ("HUD") denied the Clows' application, and the Clows sought judicial review. The district court rendered judgment for the Department on the merits, and the Clows appeal. We affirm.

## FACTS AND PROCEEDINGS

Wilson and Lynne Ann Clow refinanced their home with a federally insured loan in March 1986. The Clows had purchased their home four years earlier and apparently had never missed a payment. One year after the refinancing, however, they defaulted.

Seeking to avoid foreclosure, the Clows applied for acceptance into HUD's mortgage assistance program under the National Housing Act, 12 U.S.C. § 1701 *et seq.*

Under the terms of the program, the federal government agrees to acquire an eligible mortgagor's loan for a limited time to allow the mortgagor to overcome an unexpected financial hardship without losing his or her home. HUD denied the Clows' application on January 12, 1988. A week later, HUD invited the Clows to contest its ruling at an informal administrative meeting. The Clows appeared at the meeting, and presented additional materials in support of their application.

The Clows alleged that their inability to pay was the result of Mr. Clow's recent loss of his position with the Puget Sound Naval Shipyard, where he had worked as a marine electrician for four years. During that period, Mr. Clow had allegedly injured and reinjured his neck and right shoulder six times on the job, and he had not been able to return to work since the most recent of these episodes in February 1986. After efforts to find alternative work for him failed, the shipyard finally decided to release Mr. Clow in May 1987, the month in which the Clows defaulted.[1]

The Clows then filed for bankruptcy on July 26, 1988. In an adversary proceeding dated September 14, 1988, they prayed for (1) a declaratory judgment that HUD could not legally deny their application for assistance, and (2) injunctive relief to prevent their lender from foreclosing on their home in the meantime. The complaint did not seek injunctive relief against HUD. The court denied the request for a temporary restraining order on November 15, 1988. On December 9, 1988, the case was withdrawn from bankruptcy on HUD's motion. The district court then denied the Clows' motion for a preliminary injunction on December 16, 1988. The Clows did not appeal from either denial of their motions for preliminary relief. Shortly thereafter, the Clows' lender, City Federal Mortgage Company ("Cityfed"), foreclosed.

1. Apparently, Mrs. Clow was not employed at any time during the period in question. On the financial disclosure form that accompanied the Clows' request for mortgage assistance, Mrs. Clow attested to receiving $200 per month from welfare, food stamps, and Medicaid benefits. On that same form, Mr. Clow attested to receiving $69 per month in veteran's benefits and $50–200 per month from "self employment."

On December 23, 1988, the Clows filed an amended complaint in the district court, repeating their requests for declaratory relief against HUD and injunctive relief against Cityfed. The Clows prayed in the alternative for a replacement home "of similar value ... under the same terms and conditions [as] their present mortgage." On May 9, 1989, apparently in response to learning that Cityfed had foreclosed on the home, the parties stipulated to Cityfed's dismissal. However, the Clows did not amend their complaint and seek injunctive relief against HUD. A year of litigation followed. In the meantime, Cityfed conveyed the foreclosed property to HUD in return for payment on the loan's federal insurance. In August 1989, with no pending motion for injunctive relief pled against it, HUD sold the home through its normal property disposition process. On January 16, 1990, the parties agreed to submit their case on the record. One month later, the district court rendered judgment for HUD on the merits. The Clows timely appeal.

## DISCUSSION

### I

 HUD initially contends that because the home now belongs to an innocent third party, the case is moot. We disagree. In their first amended complaint, the Clows

prayed for "[a]n order requiring defendants HUD, Pierce and Nishimura to accept an assignment of plaintiff's home loan *or provide a home of similar value to Plaintiffs under the same terms and conditions of their [previous] mortgage.*" ER 10 (emphasis added). Hence, even after their home had been sold to an innocent third party, the Clows' complaint asserts an avenue of relief which they claimed was available to them: HUD's providing them with a home of similar value to their own under the same terms and conditions of their previous mortgage. "Where one of the several issues presented becomes moot, the remaining live issues supply the constitutional requirement of a case or controversy." *Powell v. McCormack,* 395 U.S. 486, 497, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). Accordingly, without deciding whether that relief is available to the Clows, we reject HUD's contention that this case is moot. To the extent that the relief sought by the Clows implicates jurisdictional considerations of sovereign immunity, we assume—without deciding—the existence of subject matter jurisdiction over the Clows' action. *See Norton v. Mathews,* 427 U.S. 524, 530–32, 96 S.Ct. 2771, 2774–76, 49 L.Ed.2d 672 (1976); *Wolder v. United States,* 807 F.2d 1506, 1507 (9th Cir.1987).[2]

2. The dissent's argument concerning the use of hypothetical jurisdiction is untenable. The dissent admits that our circuit has held on several occasions that where an appeal presents difficult jurisdictional questions, we may forego the resolution of these issues if the merits of the appeal are insubstantial. *See, e.g., Federal Ins. Co. v. Scarsella Bros.,* 931 F.2d 599, 602 (9th Cir.1991); *Forster v. County of Santa Barbara,* 896 F.2d 1146, 1147 n. 2 (9th Cir.1990) (per curiam); *Sundance Land Corp. v. Community First Fed. Sav. & Loan Ass'n,* 840 F.2d 653, 666 n. 15 (9th Cir.1988); *Wolder,* 807 F.2d 1506, 1507 (9th Cir.1987); *Lehner v. United States,* 685 F.2d 1187, 1189–90 (9th Cir.1982), *cert. denied,* 460 U.S. 1039, 103 S.Ct. 1431, 75 L.Ed.2d 790 (1983). Nevertheless, the dissent contends that because it believes the case upon which our circuit law relies, *Norton v. Mathews,* 427 U.S. 524, 96 S.Ct. 2771, 49 L.Ed.2d 672 (1976), does not support the theory of hypothetical jurisdiction, it has the power to repudiate prior circuit law and decide the issue anew. Such a position is incompatible with our circuit's proscription that "'[w]e are bound by decisions of prior

panels' unless an en banc decision, Supreme Court decision, or subsequent legislation undermines those decisions." *United States v. Washington,* 872 F.2d 874, 880 (9th Cir.1989) (quoting *Montana v. Johnson,* 738 F.2d 1074, 1077 (9th Cir.1984)).

The dissent does not argue that an intervening Supreme Court decision has cast doubt on our prior circuit law, rather it asserts that the very Supreme Court decision upon which these cases rely does not support their holdings. If we were all free to disregard our prior circuit law based on our own predilections as to whether these decisions properly construe the Supreme Court cases upon which they rely, the doctrine of stare decisis would have little meaning in our circuit. Accordingly, contrary to the dissent's suggestion, we have no authority to revisit our circuit's embrace of the doctrine of hypothetical jurisdiction.

In attempting to limit *Norton v. Mathews* to the particular facts of that case, the dissent ignores the Court's statement that:

It thus is evident that whichever disposition we undertake, the effect is the same. It fol-

## II

■ The Clows contend that the district court did not properly discharge its duty to conduct an inquiry into the merits of their claim. In *Citizens to Protect Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Supreme Court stated that to be proper, judicial review of an administrative decision "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 416, 91 S.Ct. at 823–24 (citations omitted). The reviewing court's obligation is threefold. First, it must determine whether the agency or department in question acted within the scope of its authority. *Id.* at 415–16, 91 S.Ct. at 823. Second, under the Administrative Procedure Act, it must decide whether the challenged action was " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Id.* at 416, 91 S.Ct. at 823 (quoting 5 U.S.C. § 706(2)(A)). Finally, the court must ensure that the agency or department "followed the necessary procedural requirements." *Id.* at 417, 91 S.Ct. at 824.

We conclude that the district court satisfied these obligations. In ruling for the defendants, the district court explicitly stated:

A review of the record presented to HUD indicates that the record facts supporting the agency action were adequately adduced and rationally applied, and that the decision was based on a consideration of the relevant factors, that there was no clear error of judgment, [and] that the act of HUD was not an abuse of discretion, contrary to law, [or] arbitrary or capricious.

*Clow v. Department of Housing & Urban Dev.,* No. C88–528TB, at 3 (W.D.Wash. Feb. 14, 1990). Our review of the several orders and rulings of the district court convinces us that it adequately considered

lows that there is no need to decide the theoretical question of jurisdiction in this case. *In the past, we similarly have reserved difficult questions of our jurisdiction when the case alternatively could be resolved on the merits in favor of the same party.* *Norton v. Mathews,* 427 U.S. at 532, 96 S.Ct. at 2775. And, as was noted by Judge Weinstein in his opinion for the Second Circuit in *Browning–Ferris Indus. v. Muszynski,* 899 F.2d 151, 154–55 (2d Cir.1990), the Supreme Court has on many other occasions decided the merits of cases in which questions of subject matter jurisdiction remain to be resolved. *See, e.g., Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 72 n. 16, 98 S.Ct. 2620, 2629 n. 16, 57 L.Ed.2d 595 (1978) (with jurisdiction over claims against one defendant established, Court assumed jurisdiction as to same claims against other defendant, because outcome would not be affected); *Philbrook v. Glodgett,* 421 U.S. 707, 721–22, 95 S.Ct. 1893, 1902, 44 L.Ed.2d 525 (1975) ("complex question of federal jurisdiction" avoided where jurisdiction existed over claims as to one defendant); *McLucas v. De Champlain,* 421 U.S. 21, 32, 95 S.Ct. 1365, 1372, 43 L.Ed.2d 699 (1975) (despite doubt that district court had subject matter jurisdiction, Court ignored the question and decided case on the merits in court-martial review case); *Secretary of the Navy v. Avrech,* 418 U.S. 676, 677–78, 94 S.Ct. 3039, 3040, 41 L.Ed.2d 1033 (1974) (per curiam) (same); *Chandler v. Judicial Council of the Tenth Circuit,* 398 U.S. 74, 86–89, 90 S.Ct. 1648, 1654–56, 26 L.Ed.2d 100 (1970) (in case involving motion for leave to file writ of mandamus or prohibition, Court avoided "knotty jurisdictional problem" and denied motion on merits); *United States v. Augenblick,* 393 U.S. 348, 350–52, 89 S.Ct. 528, 530–32, 21 L.Ed.2d 537 (1969) (Court assumed jurisdiction *arguendo* and decided collateral review of court-martial on merits). Nor are we alone in interpreting these cases to allow that in appropriate circumstances, a federal court may decide a case on the merits and assume jurisdiction when the jurisdictional issue is troublesome and resolution on the merits would not affect the outcome. *See, e.g., Cross–Sound Ferry Servs., Inc. v. ICC,* 934 F.2d 327, 333 (D.C.Cir.1991); *Edwards v. Carter,* 580 F.2d 1055, 1056–57 (D.C.Cir.), *cert. denied,* 436 U.S. 907, 98 S.Ct. 2240, 56 L.Ed.2d 406 (1978); *United States v. 5 Sylvan Road,* 928 F.2d 1, 4 (1st Cir.1991); *Kaiser v. Armstrong World Indus.,* 872 F.2d 512, 514 (1st Cir.1989); *Browning–Ferris Indus. v. Muszynsky,* 899 F.2d 151, 154–58 (2d Cir.1990); *Switlik v. Hardwicke Co.,* 651 F.2d 852, 856 n. 3 (3d Cir.), *cert. denied,* 454 U.S. 1064, 102 S.Ct. 614, 70 L.Ed.2d 601 (1981); *Southern Pac. Transp. Co. v. Usery,* 539 F.2d 386, 389 n. 1 (5th Cir.1976), *cert. denied* (1977). In the face of this overwhelming weight of authority, the only support marshalled for the dissent's contrary conclusion is that of a dissenting expression. *See Cross–Sound Ferry Servs.,* 934 F.2d at 335 (Thomas, J., dissenting in relevant part). We therefore are satisfied that our utilization of hypothetical jurisdiction under the circumstances of this case is consistent with both Supreme Court and Ninth Circuit precedent.

the numerous memoranda, affidavits, and exhibits submitted by the parties in order to reach its conclusion.[3]

### III

■ The Clows also contend that HUD's denial of their application was arbitrary and capricious, an abuse of discretion, and constituted a clear error of judgment. The Clows maintain that HUD incorrectly applied the criteria established in 24 C.F.R. § 203.650.

Under the applicable regulations, HUD will accept assignment of mortgages only when an applicant satisfies six conditions. 24 C.F.R. § 203.650(a). In the instant case, HUD determined that the Clows had not satisfied two of the six requirements for relief under its mortgage assistance program. These two criteria are as follows:

(5) The mortgagor's default has been caused by *circumstances beyond the mortgagor's control* which render the mortgagor unable to correct the delinquency within a reasonable time or make full mortgage payments.

(6) There is a *reasonable prospect* that the mortgagor will be able to resume full mortgage payments after a period of reduced or suspended payments not exceeding 36 months and will be able to pay the mortgage in full by its maturity date extended, if necessary, by up to ten years.

*Id.* § 203.650(a)(5)–(6) (emphasis added).

Upon review of the administrative record, we conclude that HUD's determination that the Clows' default had not been caused by circumstances beyond their control was not an abuse of discretion, arbitrary or capricious, or a clear error of judgment. Although the record supports the Clows' assertion that Mr. Clow was disabled and unable to perform his previous duties as an electrician, the record does not reasonably support the inference that Mr. Clow was unable to perform any job at the shipyard. On the contrary, the record supports HUD's conclusion that Mr. Clow

had been offered and refused offers of alternative employment. The Supervisor's Statement indicates that "[t]his employee was offered jobs within his limitations though it/they would have been at a lower rate of pay." Exh. XVI, ER 63. Mr. Clow's letter to the Office of Workers Compensation also indicated that he was "tired of being an assistant secretary and other such low minded jobs." Exh. XVIII, ER 66. Finally, the record supports HUD's conclusion that Mr. Clow had encouraged his termination so that he could pursue other options. The Notice of Proposed Termination indicates that Clow had made numerous requests to have himself removed from the rolls of the shipyard in order that he could pursue state-financed rehabilitation programs. Exh. XIV, ER 58.

The Clows assert, however, that the Notice of Proposed Termination contradicts the Supervisor's Statement that Mr. Clow had been offered and refused other jobs within his limitations. We disagree. The Notice of Proposed Termination states: "Your name and qualifications were referred to the Shipyard Selective Placement Coordinator who attempted to locate a vacant position within the Shipyard for which, given your physical disability, you were qualified for and able to perform. The Placement Coordinator *was not able to place you in an appropriate position.*" Exh. XIV, ER 59 (emphasis added). This statement does not necessarily indicate that *other jobs were not found and offered* to Mr. Clow, it only indicates that he was not placed in any such position. In the absence of a more definitive explanation, the Placement Coordinator's inability to place Mr. Clow reasonably can be interpreted to have resulted just as well from Mr. Clow's refusal to accept an offered position as from an inability to find any such alternate position. Hence, because the Notice of Proposed Termination is ambiguous on this point, we reject the Clows' contention that it necessarily contradicts the Supervisor's Statement.

---

**3.** We also reject the Clows' contention that the district court erred by considering certain affidavits submitted by HUD. In its final ruling,

the district court explicitly stated that it did not consider the challenged affidavits. *Clow,* No. C88–528TB, at 1–2 (W.D.Wash. Feb. 14, 1990).

Accordingly, we hold that HUD's determination that the Clows' default had not been caused by circumstances beyond their control was not an abuse of discretion, arbitrary or capricious, or a clear error of judgment. Because all six criteria set forth in 24 C.F.R. § 203.650(a) must be met before mortgage assistance will be granted, we need not reach the question of whether HUD erred in determining that the Clows had not established a reasonable prospect to resume their mortgage payments within a required period of time or whether HUD's adoption of the prudent lender standard is contrary to the intent of Congress.

AFFIRMED.

O'SCANNLAIN, Circuit Judge, dissenting:

Because it is clear that this court lacks jurisdiction to address the merits of this action, I respectfully dissent. The Clows' claims for declaratory and injunctive relief to compel HUD to provide mortgage assistance and to prevent the loss of their home are regrettably but undeniably moot (*see infra* Part II), and the court lacks the statutory authority to entertain their alternative prayer for a replacement home (*see infra* Part III).

Surprisingly, my colleagues dispute neither of these assertions but nonetheless conclude that we may reach the merits of the Clows' appeal. They reach this conclusion by invoking a vaguely defined and highly questionable theory that some have referred to as "hypothetical jurisdiction." *See, e.g.,* Comment, *Assuming Jurisdiction Arguendo: The Rationale and Limits of Hypothetical Jurisdiction,* 127 U.Pa. L.Rev. 712 (1979). According to this theory, a court may assume—without deciding—that it has proper jurisdiction to enter-

tain an appeal "where the jurisdictional question is complex and the appeal is clearly without merit." *Wolder v. United States,* 807 F.2d 1506, 1507 (9th Cir.1987) (per curiam), *cited ante* at 616.

In short, the court today perpetuates a dubious notion, premised largely upon a misreading of the Supreme Court's decision in *Norton v. Mathews,* 427 U.S. 524, 96 S.Ct. 2771, 49 L.Ed.2d 672 (1976), which posits that if a case is especially easy to decide on the merits, it need not satisfy a statutory grant of jurisdiction or meet the case-or-controversy requirement of article III. Because I perceive no such exception to the important constitutional and statutory limitations on judicial power and because the theoretical and practical dangers of recognizing such an exception are immense (*see infra* Part IV), I must dissent.

I

A

The Department contends that because the home now belongs to an innocent third party, the case is moot. Although not for the reasons advanced by HUD,[1] I find this argument both persuasive and dispositive. A case becomes moot when a judicial determination of the legal issues tendered by the parties would no longer affect the practical result. *See DeFunis v. Odegaard,* 416 U.S. 312, 317, 94 S.Ct. 1704, 1706, 40 L.Ed.2d 164 (1974) (per curiam) (" 'Where the activities sought to be enjoined have already occurred, and the appellate courts cannot undo what has already been done, the action is moot.' "); *Headwaters, Inc. v. Bureau of Land Management,* 893 F.2d 1012, 1015 (9th Cir.1989) (quoting *Friends of the Earth, Inc. v. Bergland,* 576 F.2d 1377, 1379 (9th Cir.1978)); *see also United States v. Alder Creek Water Co.,* 823 F.2d 343, 345 (9th Cir.1987) ("A case becomes

1. The Department relied on one case for its mootness argument: *Fair v. EPA,* 795 F.2d 851 (9th Cir.1986). That case is clearly distinguishable. In *Fair,* the plaintiff sought a judgment declaring that the defendant had a duty to conduct further study before approving construction of a sewer line. The district court dismissed the complaint, and the plaintiff appealed. On appeal, this court dismissed the action

as moot because the sewer line had been fully constructed in the meantime. It is, of course, virtually impossible to conduct a pre-approval study after completion of the project in question. The Clows, on the other hand, do not ask for a virtual impossibility. They appear, however, to ask for a legal impossibility—as I explain herein.

moot when interim relief or events have deprived the court of the ability to redress the party's injuries.").

Even if the court were to conclude that HUD acted arbitrarily and capriciously in denying the Clows' application, such a ruling would offer the Clows no meaningful relief. The Department can no longer provide the mortgage assistance for which the Clows applied. The mortgage in question no longer exists. The home in question is apparently in the hands of a bona fide purchaser who is not a party to the action and who presumably offered good value for the property without notice of the Clows' claim. To dispossess that owner in order to reinstall the Clows would exceed the equitable powers of the court. In short, the Clows cannot possibly profit from a declaratory or injunctive ruling in their favor.

### B

Diverting attention from the apparent absence of meaningful relief, the Clows frame their argument in the language of fairness. To adjudge the case moot, they insist, would be unjust. It would allow HUD to benefit unfairly from its ability to dispose of property before the courts have had an opportunity to act. The Clows point to two decisions of this circuit in support of their contention: *People of Saipan v. Department of Interior*, 502 F.2d 90 (9th Cir.1974), *cert. denied*, 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975), and *National Forest Preservation Group v. Butz*, 485 F.2d 408 (9th Cir.1973). Both cases are distinguishable.

In *People of Saipan*, citizens of the Trust Territory of the Pacific Islands sued to prevent the execution of a lease that was designed to allow an American airline to build a hotel on public land that had special cultural importance to the Islanders. In the words of the court, the airline contended that it "ha[d] acquired some equities by proceeding with the construction of its hotel while its right to do so [was] being litigated." 502 F.2d at 100. Noting that the airline had apparently commenced

building in anticipation of the litigation, the court rejected this contention.

Similarly, in *National Forest Preservation Group*, the plaintiff organization challenged the government's conveyance of certain public lands to a major corporation. The district court granted summary judgment for the defendant and denied the plaintiff's request for an injunction pending appeal. Two days later, the government conveyed the land to the corporation, and the corporation immediately transferred a large portion of it to an independent third party. On appeal, this court ruled that such speedy transfers during the pendency of the appeal could not put the legality of the conveyances beyond the jurisdiction of the court.

For its holdings in both *People of Saipan* and *National Forest Preservation Group*, the court relied on a passage from the Supreme Court's decision in *Jones v. Securities and Exchange Comm'n:*

> [A]fter a defendant has been notified of the pendency of a suit seeking an injunction against him, even though a temporary injunction be not granted, he acts at his peril and subject to the power of the court to restore the status, wholly irrespective of the merits as they may be ultimately decided.

*Jones*, 298 U.S. 1, 17–18, 56 S.Ct. 654, 658, 80 L.Ed. 1015 (1936); *see People of Saipan*, 502 F.2d at 100 (quoting this passage); *National Forest Preservation Group*, 485 F.2d at 411 (same).

The Clows thus contend that HUD "acted at its peril" when it sold their former home and that HUD cannot fairly claim that the case is now moot because of that transfer. As a matter of fundamental fairness, the Clows' argument has great appeal. As a rebuttal to the doctrine of mootness, however, it does not. Both Ninth Circuit cases, as well as the Supreme Court case, are distinguishable.

*Jones*, for example, did not involve a question of mootness at all. In fact, neither the majority nor the dissenting opinion ever mentions that word. The relevant issue in *Jones* was what effect the pendency of a stop-order proceeding should have

on the target of the prospective stop order—in that case, a securities registration statement that had been filed but had not yet become effective. The Supreme Court held that a stop-order proceeding is analogous to a suit for an injunction in equity and that once on notice, the defendant acts at his peril when he relies on his assumed rights in the target of the prospective order. In short, the Court's holding simply stands for the proposition that claims of detrimental reliance will fall on deaf ears when the party seeking sympathy had notice of the pending litigation before the asserted acts of reliance occurred. The *Jones* holding thus defangs a particular argument that defendants have commonly used in equity actions, but it does not at all affect the law of mootness. The Court did not say that future acts of the defendant have no capacity to render proceedings on the subject moot or that an *irrevocable disposal* of the target of the court's order has no effect on the viability of pending litigation. Indeed, the Court explicitly recognized the inherent limitation in its holding: "[A]fter a defendant has been notified of the pendency of a suit seeking an injunction against him, ... he acts at his peril and *subject to the power of the court to restore the status.*" *Jones*, 298 U.S. at 17–18, 56 S.Ct. at 658 (emphasis added). Where the court is without power to restore the status, it follows that the defendant does not act at his peril.

*National Forest Preservation Group* was a straightforward application of the *Jones* rule. There, the defendant corporation claimed that because it had transferred much of the land in question to an independent third party, the court had lost jurisdiction to adjudicate the dispute. The court rejected this contention as "[n]onsense" because it still possessed the capacity to render effective relief. *National Forest Preservation Group*, 485 F.2d at 411. Indeed, the court still had jurisdiction over the land and all the relevant parties, *including* the independent third party: the transfers had only been "from one party to the litigation to another." *Id.* These facts distinguish *National Forest Preservation Group* from the present case and demonstrate that, like *Jones*, it did not involve mootness at all.[2]

Similarly, in *People of Saipan*, the question was whether the defendant airline could escape operation of a future court order by commencing construction of the challenged project. So long as both the airline and the site remained within the jurisdiction of the court, the answer was dictated by *Jones:* having been on notice of the litigation, the defendant could not fairly escape the force of the order. Such a holding, however, suggests nothing about mootness.

### C

By relying on cases that have applied the *Jones* rule, which is essentially an equitable rule of fairness, the Clows have side-stepped the jurisdictional issue to focus upon fairness concerns. Their desire to do so is understandable: considerations of fairness do seem to weigh in the Clows' favor. If there is any merit to the Clows' claims, dismissal could reward government misconduct. Dismissal also suggests that HUD may escape judicial review through its own quick actions. In light of the underlying claims and policies here, that prospect seems especially disturbing. The mortgage assistance program was established to assist homeowners in dire straits, who have an especially earnest need for effective review of their claims. Moreover, because HUD is a government agency whose guiding aim is to serve the public

---

2. The court's discussion of *Jones* appears under the heading "MOOTNESS," but there is no discussion of the mootness doctrine per se in the court's opinion and no other mention of the word. *See National Forest Preservation Group*, 485 F.2d at 410–11. Moreover, in addition to citing *Jones*, *National Forest Preservation Group* cited the Supreme Court's decision in *Porter v. Lee*, 328 U.S. 246, 66 S.Ct. 1096, 90 L.Ed. 1199 (1946). *See* 485 F.2d at 411. *Porter* was also an application of the *Jones* rule and not a mootness case. There, the Court held that "where a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may by mandatory injunction restore the *status quo.*" 328 U.S. at 251, 66 S.Ct. at 1099 (citation omitted).

interest, there is no justifiable profit motive driving its actions; to an even greater degree than the average litigant, HUD should have the capacity and the obligation to defer action on a matter that it knows to be the subject of a pending dispute.

As a matter of policy, these arguments may seem persuasive, but mootness is not a matter of policy; it is a matter of power. "[F]ederal courts are without power to decide questions that cannot affect the rights of litigants in the case before them." *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971) (per curiam). Mootness is a doctrine of jurisdiction; it is not a doctrine of discretion. *See id.* ("Mootness is a jurisdictional question because the Court 'is not empowered to decide moot questions or abstract propositions.'") (quoting *California v. San Pablo & Tulare Ry. Co.*, 149 U.S. 308, 314, 13 S.Ct. 876, 878, 37 L.Ed. 747 (1893), *quoted in United States v. Alaska S.S. Co.*, 253 U.S. 113, 116, 40 S.Ct. 448, 449, 64 L.Ed. 808 (1920)); *see also id.* ("the question of mootness is a federal one which a federal court must resolve before it assumes jurisdiction").

The federal courts' "impotence 'to review moot cases derives from the requirement of Article III of the Constitution under which the exercise of judicial power depends upon the existence of a [live] case or controversy.'" *Id.* (quoting *Liner v. Jafco, Inc.*, 375 U.S. 301, 306 n. 3, 84 S.Ct. 391, 394 n. 3, 11 L.Ed.2d 347 (1964)). When the court ceases to be able to affect the legal relationship between the parties upon the complaint before it, that is the end of the inquiry. The court stands like an unplugged appliance. The judicial power is lost, and there is no jurisdiction for a consideration of the equities.

## D

### 1

The Supreme Court has yielded its adherence to this firm position in only two sorts of cases. The first category includes disputes "capable of repetition, yet evading review." *Southern Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). In these cases the duration of litigation invariably exceeds the life of the underlying dispute, and the Court has held that an exception to traditional mootness analysis is necessary to afford the complaining party an opportunity to litigate its rights. *See, e.g., Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147 (1973) (because usual appellate process exceeds nine months, litigation of right to abortion does not become moot when claimant's pregnancy comes to term).

This narrow exception does not apply to the current case for two reasons. First, the type of dispute involved must be one that would *invariably* evade review if adjudged moot. *See id.; see also Southern Pac. Terminal Co.*, 219 U.S. at 516, 31 S.Ct. at 284. The Clows have not alleged that HUD's policies, by their nature, will always preempt appellate review of a denial of mortgage assistance. Second, the dispute must have a capacity for repetition *between the current parties;* it is not enough that the same issue might provoke a similar dispute between the defendant and a third party. *See DeFunis*, 416 U.S. at 319, 94 S.Ct. at 1707 (dismissing case as moot) ("the question is certainly not 'capable of repetition' so far as [the plaintiff] is concerned"); *Roe*, 410 U.S. at 125, 93 S.Ct. at 713 (adjudging case not moot) ("[p]regnancy often comes more than once to the same woman"); H. Hart & H. Wechsler, *The Federal Courts & the Federal System* 208 (3d ed. 1988) ("Recent decisions emphasize that, in the absence of a class action, the question in such cases is the possibility of recurrence with respect to the complaining party.") (citing *Murphy v. Hunt*, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982) and *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975)). The Clows have not suggested that this problem is likely to plague them again.

### 2

The second category of exceptional cases includes the so-called "voluntary cessation" cases. These cases stand for the proposition that "voluntary cessation of allegedly

illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot." *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). The logic that supports this rule is plain: a controversy does not cease to be "live" when the defendant voluntarily and temporarily suspends the challenged practice in an effort to evade judicial review. If there is "a sufficient possibility of a recurrence" once the litigation subsides, the controversy is not moot. H. Hart & H. Wechsler, *supra*, at 206 (citations omitted). In this case, " 'there is no reasonable expectation that the wrong will be repeated' " once the action is dismissed, and HUD has not voluntarily suspended any challenged conduct in an effort to render the action moot. *DeFunis*, 416 U.S. at 318, 94 S.Ct. at 1706 (quoting *W.T. Grant Co.*, 345 U.S. at 633, 73 S.Ct. at 897). Accordingly, neither of the recognized exceptions to the mootness doctrine applies here.

## II

The majority nonetheless concludes that the Clows' action is not moot because "even after their home had been sold to an innocent third party, the Clows' complaint assert[ed] an avenue of relief which they claimed was available to them; HUD's providing them with a [substitute] home of similar value to their own under the same terms and conditions [as] their previous mortgage." *Ante* at 616. This argument misses the mark. The Clows' prayer for a replacement home cannot confer power upon the court to decide an otherwise moot action because the court lacks the *statutory* power to entertain such a prayer. A request for a replacement home is in effect a request for damages, and the Administrative Procedure Act ("APA"), upon which the Clows' right to judicial review is predicated, expressly retains the government's sovereign immunity and precludes judicial review with respect to damages claims.

Section 10 of the APA provides in pertinent part:

A person suffering legal wrong because of agency action, or adversely af-fected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief *other than money damages* and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702 (1988) (emphasis added); *see also id.* § 701(a)(1) ("This chapter applies ... except to the extent that statutes preclude judicial review."). Courts have repeatedly construed this provision to mean that the APA does not confer power on the federal courts to entertain actions against the United States for money damages. *See, e.g., Rowe v. United States*, 633 F.2d 799, 801 (9th Cir.1980), *cert. denied*, 451 U.S. 970, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981); *Hill v. United States*, 571 F.2d 1098, 1102 & n. 7 (9th Cir.1978); *see also Bowen v. Massachusetts*, 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988).

Courts have also repeatedly held that "a plaintiff may not transform a claim for monetary relief into an equitable action simply by asking for an injunction that orders the payment of money." *New Mexico v. Regan*, 745 F.2d 1318, 1322 (10th Cir.1984) (citing *Jaffee v. United States*, 592 F.2d 712, 715 (3d Cir.1979)), *cert. denied*, 471 U.S. 1065, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985). Indeed, courts "have emphasized that if the 'prime objective' or 'essential purpose' of the claim is to recover money from the federal government, the action [is not cognizable under the APA]." *Hamilton Stores, Inc. v. Hodel*, 925 F.2d 1272, 1278 (10th Cir.1991); *see also id.* at 1276–79; *New Mexico*, 745 F.2d at 1322 (citing, inter alia, *Bakersfield City School Dist. v. Boyer*, 610 F.2d 621, 628 (9th Cir. 1979)). As the Tenth Circuit explained in *Hamilton Stores*, even when "[the plaintiff's] prayer for relief does not request money damages, we scrutinize claims against the United States to be certain that the plaintiff has not endeavored to 'trans-

form a claim for monetary relief into an equitable action simply by asking for an injunction that orders the payment of money.'" *Hamilton Stores*, 925 F.2d at 1278 (quoting *New Mexico*, 745 F.2d at 1322)).

Our scrutiny in this regard must be strict not only because the issue is jurisdictional in nature but also because it implicates concerns of sovereign immunity; the federal government has elected not to waive its immunity to damage awards under the APA, and the courts must honor that decision. *See General Atomic Co. v. United Nuclear Corp.*, 655 F.2d 968, 968–69 (9th Cir.1981) (jurisdictional statutes are to be interpreted strictly; federal courts are courts of limited jurisdiction, and doubts are to be resolved against the assumption of such jurisdiction), *cert. denied*, 455 U.S. 948, 102 S.Ct. 1449, 71 L.Ed.2d 662 (1982); *Woodbridge Plaza v. Bank of Irvine*, 815 F.2d 538, 544 (9th Cir.1987) (Fletcher, J., dissenting) (same); *see also Irwin v. Veterans Admin.*, —— U.S. ——, 111 S.Ct. 453, 456, 112 L.Ed.2d 435 (1990) (a waiver of sovereign immunity "must be strictly construed").

Here, there can be no doubt that the Clows' request for a replacement home constitutes a request for money damages within the meaning of the APA. The Supreme Court itself has made this clear. The Court recently defined the term "money damages" within the context of section 702 in *Bowen v. Massachusetts*, 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988). Writing for the Court, Justice Stevens adopted the reasoning and analysis of a District of Columbia Circuit decision:

Judge Bork's explanation of the plain meaning of the critical language in this statute merits quotation in full. In his opinion for the Court of Appeals for the District of Columbia Circuit in *Maryland Dept. of Human Resources v. Department of Health & Human Services*, 246 U.S.App.D.C. 180, 763 F.2d 1441 (1985), he wrote:

> We turn first to the question whether the relief Maryland seeks is equivalent to money damages....
>
> We begin with the ordinary meaning of the words Congress employed. The term "money damages," 5 U.S.C. § 702, we think, normally refers to a sum of money used as compensatory relief. Damages are given to the plaintiff to *substitute* for a suffered loss, whereas specific remedies "are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." D. Dobbs, *Handbook on the Law of Remedies* 135 (1973).

*Bowen*, 487 U.S. at 894–95, 108 S.Ct. at 2732 (quoting *Maryland Department of Human Resources*, 763 F.2d at 1446 (emphasis in original)) (footnote omitted); *see also Bowen*, 487 U.S. at 914, 108 S.Ct. at 2742 (Scalia, J., dissenting) ("Whereas damages compensate the plaintiff for a loss, specific relief prevents or undoes the loss—for example, by ordering return to the plaintiff of the precise property that has been wrongfully taken, or by enjoining acts that would damage the plaintiff's person or property.") (citing 5A A. Corbin, *Contracts* § 1141, at 113 (1964), and Dobbs, *supra*, at 135).[3]

**3.** Thus, under *Bowen*, the fact that a claimant has not requested money per se does not necessarily mean that he has not requested "money damages." Nor, for that matter, is the converse necessarily true: a claim that *does* specify money is not by virtue of that fact alone always a claim for money damages. *See Bowen*, 487 U.S. at 893, 108 S.Ct. at 2731 ("The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'"); *id.* at 895, 108 S.Ct. at 2732 ("'while in many instances an award of money is an award of damages, "[o]ccasionally a money award is also a specie remedy."'") (quoting *Maryland Department of Human Resources*, 763 F.2d at 1446 (quoting D.

Dobbs, *supra*, at 135)). For example, a claim for back wages or for the provision of Medicaid benefits that were improperly disallowed is a request for specific relief that just happens to be monetary. *See id.* 487 U.S. at 900, 108 S.Ct. at 2735; D. Dobbs, *supra*, at 135.

*Bowen* therefore places critical emphasis on the substantive nature of the remedy, rather than its specific form. In order to give the waiver of sovereign immunity contained in section 702 its proper effect, courts must regard claims for money as claims for specific relief when the money is, in fact, the specie—"the very thing"—to which the plaintiff claims he is entitled. *Id.* On the other hand, in order to pre-

The Clows' request for a replacement home is a request for *compensatory* relief intended to *substitute* for a suffered loss; it is not a request for *specific* relief intended to *return* to the Clows the actual "specie" to which they claim they are entitled and of which they claim they were wrongfully deprived. *See* Dobbs, *supra*, at 135. Indeed, it is literally definitional that a request for a substitute home is, in Professor Dobbs's words, a request for a "substitutionary" remedy. *Id.* It follows, therefore, that we must regard the Clows' request as a prayer for money damages which the federal courts have no authority to entertain under the APA.

### III

My colleagues do not directly dispute this reasoning. Rather, they conclude that the court may assume jurisdiction over the Clows' claim for a replacement home *without deciding* whether such jurisdiction is proper. The court, they hold, may exercise what some have dubbed "hypothetical jurisdiction." *See* Comment, *supra*, 127 U.Pa. L.Rev. at 713.

### A

For reasons eloquently expressed by Judge Clarence Thomas in a recent case before the District of Columbia Circuit, I cannot agree:

Federal courts are courts of limited jurisdiction. When federal jurisdiction does not exist, federal judges have no authority to exercise it, even if everyone—judges, parties, members of the public—wants the dispute resolved. [Citations omitted.] It follows that federal courts have a " 'special obligation' " to appraise at the outset their own jurisdiction, even when the parties, or the lower courts, have not raised any jurisdictional questions themselves. *FW/PBS, Inc. v. City of Dallas,* [493 U.S. 215] 110 S.Ct. 596, 607 [107 L.Ed.2d 603] (1990) (citation omitted). This tenet is as solid as bed-

rock and almost as old. [Citations omitted].

*Cross–Sound Ferry Servs., Inc. v. ICC,* 934 F.2d 327, 339 (D.C.Cir.1991) (Thomas, J., dissenting in relevant part); *see also Mansfield, Coldwater & Lake Mich. Ry. v. Swan,* 111 U.S. 379, 382, 4 S.Ct. 510, 511, 28 L.Ed. 462 (1884) (rule requiring courts to examine their own jurisdiction "is inflexible and without exception"); Fed.R.Civ.P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

Without assuring itself that it has actual jurisdiction, a court has no power to proceed further. It has no power even to suggest that the action may be insubstantial on the merits. The concept of hypothetical jurisdiction is therefore nonsensical: without actual jurisdiction, the court cannot act, and it is illogical to suggest that "hypothetical" jurisdiction may exist where actual jurisdiction may not.

The truistic constraint on the federal judicial power, then, is this: A federal court may not decide cases when it cannot decide cases, and must determine whether it can, before it may. The majority here changes this fundamental precept to read, in effect, that under certain circumstances a federal court should decide cases regardless of whether it can, and need not determine whether it can, before it does. This revision seems to me difficult to square with the Supreme Court's regular warnings to the federal courts to fulfill their "special obligation" to inquire into their own jurisdiction at the outset....

The Supreme Court reiterated this principle twice last Term. [*See Carden v. Arkoma Associates,* [494 U.S. 185] 110 S.Ct. 1015 [108 L.Ed.2d 157] (1990), and *FW/PBS,* 110 S.Ct. 596].

\* \* \* \* \* \*

Read in light of one hundred and eighty-seven years of other precedents, the Supreme Court's opinions in *FW/*

---

vent artful pleaders from eroding the sovereign immunity that section 702 expressly *retains,* courts must treat nonmonetary relief as money

damages when, as here, the relief is purely compensatory in nature.

*PBS* and *Carden* confirm that federal courts must first assure themselves that they have the authority to hear a dispute before they may decide the dispute on the merits. *See FW/PBS*, 110 S.Ct. at 607–08; *Carden*, 110 S.Ct. at 1021. Federal courts simply may not assume jurisdiction hypothetically. Some cases might cry out for decision on the merits; some might pose difficult jurisdictional problems. Our threshold duty to examine our own jurisdiction is no less obligatory in either instance.

*Cross–Sound Ferry*, 934 F.2d at 340, 345–46 (Thomas, J., dissenting in relevant part).

### B

*Norton v. Mathews*, 427 U.S. 524, 96 S.Ct. 2771, 49 L.Ed.2d 672 (1976), upon which the majority relies, does not suggest otherwise. *Norton* involved a direct appeal from a three-judge district court, and it presented a difficult jurisdictional question conjoined with an extremely simple merits question. The answer to the merits question was clear because the Court had just decided the identical issue in a companion case. *Mathews v. Lucas*, 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976). The jurisdictional question, on the other hand, was quite subtle and concerned whether the three-judge district court had been properly convened.

Writing for the Court, Justice Blackmun concluded that it was unnecessary to decide the jurisdictional question because it was obvious after *Lucas* that there was no merit to the underlying appeal. Justice Blackmun, however, did *not* conclude (and the Court did not hold) that a decision on the merits of an appeal can be entered without the usual inquiry into the propriety of jurisdiction—or, for that matter, without proper jurisdiction itself. Rather, the Court held that it did not need to decide *the particular jurisdictional question at issue* in *Norton* in order to affirm on the merits there because under either possible answer to that question, the outcome would be the same. As Justice Blackmun explained:

> Assuming that the three-judge district court was correctly convened, and that we have jurisdiction over the appeal, the appropriate disposition, in the light of *Mathews v. Lucas*, plainly would be to affirm.... Assuming, on the other hand, that we lack jurisdiction because the three-judge district court was needlessly convened, the appropriate disposition would be to dismiss the appeal. *When an appeal to this Court is sought from an erroneously convened three-judge district court*, [however,] we retain the power " 'to make such corrective order as may be appropriate to the enforcement of the limitations' " which 28 U.S.C. § 1253 imposes. What we have done recently, and in most such cases where the jurisdictional issue was previously unsettled ... has been to vacate the district court judgment *and remand the case for the entry of a fresh decree from which an appeal may be taken to the appropriate court of appeals....* In the present case, however, the decision in *Lucas* has rendered the [underlying] issues insubstantial and so much so as not even to support the jurisdiction of a three-judge district court to consider their merits on remand. Thus, there is no point in remanding to enable the merits to be considered by a court of appeals.

*Norton*, 427 U.S. at 531–32, 96 S.Ct. at 2775 (citations omitted and emphasis added).

In other words, a determination that the three-judge district court was improperly convened in *Norton* would not have meant the absence of district court jurisdiction *altogether;* it would only have meant that there was no jurisdiction for a *three-judge* district court. Jurisdiction in an ordinary, one-judge district court would presumably still lie. Given that fact, rather than dismiss the appeal outright, the Supreme Court ordinarily would be inclined to remand "for the entry of a fresh decree [by a one-judge district court] from which an appeal [could then] be taken to the appropriate court of appeals." *Id.* In *Norton*, however, remanding for the entry of an appropriately appealable decree made little sense because the outcome of any such appeal was already foreordained by *Lucas*.

In short, the knotty jurisdictional question that the *Norton* Court abstained from deciding was not a question of jurisdiction *vel non*, but a question of which of two jurisdictional schemes, both of which were equally capable of conferring power on the district court, properly applied. Indeed, it was clear that the district court *did* have proper jurisdiction in one form or another. The only question was whether a one-judge court or a three-judge court was the appropriate form. Given the nature of that question, the Supreme Court could either (a) resolve its doubts in favor of jurisdiction and affirm on the merits or (b) vacate and remand for further proceedings that would cure the jurisdictional problem but that would ultimately have to favor the same party on the merits. Either way, the same party would prevail and would do so *on the merits.* In choosing the first and more efficient option, therefore, the Supreme Court did not ignore or pass over the threshold question of jurisdiction *vel non*, as the majority has here. On the contrary, it implicitly acknowledged that the district court's jurisdiction—in one form or another—was certain and that nothing depended upon a resolution of the precise nature of that jurisdiction because the same party would prevail *on the merits* in either event.

### C

Unfortunately, several very recent decisions by this court have suggested—as the majority again does here—that *Norton* stands for some broader notion of hypothetical jurisdiction. *See Federal Ins. Co. v. Scarsella Bros.*, 931 F.2d 599, 602 (9th Cir.1991) ("Where an appeal presents difficult questions concerning jurisdiction, we may forego the resolution of such issues if the merits of the appeal are insubstantial.") (citing *Norton*); *Forster v. County of Santa Barbara*, 896 F.2d 1146, 1147 n. 2 (9th Cir.1990) (per curiam); *Sundance*

Land Corp. v. Community First Fed. Sav. & Loan Ass'n, 840 F.2d 653, 666 n. 15 (9th Cir.1988); *Wolder*, 807 F.2d 1507; *Lehner v. United States*, 685 F.2d 1187, 1190 (9th Cir.1982), *cert. denied*, 460 U.S. 1039, 103 S.Ct. 1431, 75 L.Ed.2d 790 (1983). Standing alone, these decisions would perhaps command our allegiance as circuit law. Not one of these decisions, however, provides any analysis to support such a reading of *Norton*—especially in light of both pre- and post-*Norton* decisions by the Supreme Court which have implicitly rejected the concept of hypothetical jurisdiction. Indeed, not one endeavors to explain the nature or limits of this novel theory. The decisions simply cite *Norton* (and each other) as authority. *Cf.* Comment, *supra*, 127 U.Pa.L.Rev. at 713 ("This practice of assuming jurisdiction arguendo, here dubbed 'hypothetical jurisdiction,' has developed for the most part without examination.").[4]

*Norton*, however, does not support such a principle. To read *Norton* so broadly is to misconstrue the nature of the jurisdictional question presented in that case: *Norton* involved concerns that are unique to the convening of a three-judge district court and did not implicate the question of jurisdiction *vel non*. More importantly, such an understanding of *Norton* contradicts time-worn principles and innumerable precedents that exhort federal courts to examine the sources of their presumed authority before acting upon them. *See Cross–Sound Ferry*, 934 F.2d at 339–45 (Thomas, J., dissenting in relevant part) (citing and discussing many of these innumerable precedents and criticizing similar readings of *Norton* by the District of Columbia Circuit). Indeed, one advocate of hypothetical jurisdiction has conceded as much. After analyzing all the Supreme Court decisions from which one could infer even a hint of approval for the notion, this

**4.** Some have suggested that where the party seeking jurisdiction would not prevail in either event, it is irrelevant whether the court decides the case on jurisdictional grounds or on the merits. *See, e.g., Browning–Ferris Indus. v. Muszynski*, 899 F.2d 151, 159, 160 (2d Cir.1990); Comment, *supra*, 127 U.Pa.L.Rev. at 736–37, 748. That suggestion is demonstrably untrue.

The collateral ramifications of a decision on the merits are clearly different from those that attend a dismissal on jurisdictional grounds. Res judicata, for example, will only attach to a decision on the merits. Private agreements among the parties or between the parties and their attorneys or indemnitors may also be affected by the form of the court's decision.

student candidly concluded that "there is thus no Supreme Court opinion unequivocally holding that it is permissible to assume justiciability and rule on the substantive merits." Comment, *supra*, 127 U.Pa. L.Rev. at 745.[5]

Within the context of our constitutional system, the concept of hypothetical jurisdiction simply has no place. A court has no discretion where it has no power, and to suggest otherwise is to erode a fundamental limitation on the exercise of judicial authority. Without a coherent rationale to justify its application or to limit its reach, the concept of hypothetical jurisdiction threatens to swallow numerous statutory restraints on the federal courts. In fact, the continued proliferation of this notion could lead to a regime in which the only check on judicial power is a court's own disinclination to reach the merits. That, I would suggest, invites judicial arrogance.

In a wholly different context, a wiser lawyer than most once warned: "It is as much the duty of Government to render prompt justice against itself, in favor of citizens, as it is to administer the same between private individuals." Cong.Globe, 37th Cong., 2d Sess. (1861 App.2d) (quoting President Lincoln). As an instrument of government, the federal courts have a "'special obligation'" to restrain themselves when the law indicates that they have no power. *FW/PBS*, 110 S.Ct. at 607 (quoting *Mitchell v. Maurer*, 293 U.S. 237, 244, 55 S.Ct. 162, 165, 79 L.Ed. 338 (1934)). We have no power here.

### IV

The Clows' primary requests for declaratory and injunctive relief are moot: the mortgage in question no longer exists, and

the home in question is no longer before the court. The Clows' alternative prayer for a replacement home does nothing to cure this problem because the court lacks the statutory authority to entertain that claim under the APA. Finally, despite the majority's contrary conclusion, hypothetical jurisdiction cannot lie where actual jurisdiction is clearly absent. Indeed, the very concept of hypothetical jurisdiction is indefensible.

I would therefore vacate the district court's judgment and remand with instructions to dismiss the Clows' complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

---

5. Courts in this circuit that have invoked the notion of hypothetical jurisdiction have generally relied upon *Norton* as their primary authority for doing so. In other circuits, courts that have invoked the theory have generally relied upon three other Supreme Court decisions, in addition to *Norton*: (1) *Secretary of the Navy v. Avrech*, 418 U.S. 676, 94 S.Ct. 3039, 41 L.Ed.2d 1033 (1974) (per curiam); (2) *Chandler v. Judicial Council*, 398 U.S. 74, 90 S.Ct. 1648, 26 L.Ed.2d 100 (1970); and (3) *United States v. Augenblick*, 393 U.S. 348, 89 S.Ct. 528, 21

L.Ed.2d 537 (1969). These cases are among those discussed in the Pennsylvania Comment. *See* Comment, *supra*, 127 U.Pa.L.Rev. at 733–53. Judge Thomas has persuasively explained why a similar reliance on these decisions is also unjustified. *See Cross–Sound Ferry*, 934 F.2d at 342–45 (Thomas, J., dissenting in relevant part).