Opinion by Judge O’SCANNLAIN; Concurrence by Judge BERZON.
OPINION
O’SCANNLAIN, Circuit Judge:
We must decide whether the Confrontation Clause or the Federal Rules of Evidence prohibit the government from introducing at trial a defendant’s admissions to a police officer because the translator who facilitated them, while conversationally fluent, would not qualify as a court interpreter.
I
Claudio Romo-Chavez is a citizen and national of Mexico. In May 2009, he attempted to enter this country at the De-Concini Port of Entry in Nogales, Arizona, driving a 1999 Buick Century. During primary inspection, he was greeted by Customs and Border Protection (“CBP”) Officer Brian Tipling. Romo-Chavez told Officer Tipling that he was from Magdalena, Mexico, and that he was entering the United States to return two shirts to the Dillard’s store in Scottsdale. Finding the story suspicious, Officer Tipling employed a long-handled mirror to examine the underside of Romo-Chavez’s vehicle and found evidence of tampering on the bolt holding the fuel tank to the undercarriage.
Romo-Chavez was referred to secondary screening, where he told CBP Officer *958 David Aldrich that he was from somewhere between Obregon and Hermosillo, Mexico (several hours by car south of Magdalena). He also stated that he was going to “ ‘Tucson, maybe Phoenix,’ ” and that “part of it was for business and part of it was for pleasure.”[1] Aldrich, alerted by Tipling and similarly suspicious of Romo-Chavez’s story, examined the Buick. He noticed a tampering in the backseat area above the gas tank as well as a smell he associated with secret compartments.
A
CBP Officer Jeff Steger arrived with his drug detection dog, who alerted to something in the vehicle. He informed his supervisor, who called away Officer Aldrich. At this time, Officer Steger collected some personal items from the Buick, which he deemed to be of no evidentiary value and placed them into a bag for storage. Romo-Chavez was promptly notified how he could collect these items.[2] Another CBP Officer, Edward Vejar, pried open a carefully constructed box located in the Buick’s gas tank and found a number of packages containing white crystalline material, which tested presumptively positive for methamphetamine.
B
While Officers Steger and Vejar were collecting these items, Romo-Chavez was questioned by Special Agent Andrew Sim-boli of Immigration and Customs Enforcement (“ICE”). Romo-Chavez told Simboli that he was from Nogales, Mexico (which is north of both Magdalena and Obregon) and provided some basic biographical information. Having exhausted his knowledge of Spanish, Agent Simboli required a translator to facilitate further conversation.
With the assistance of CBP Officer David Hernandez, Agent Simboli Miran-dized Romo-Chavez in Spanish. Officer Hernandez then translated as Romo-Cha-vez explained that he came to the United States to return two shirts to a Dillard’s in Phoenix. When Agent Simboli asked why he was not going to the Dillard’s in Tucson, Romo-Chavez changed his answer to say that he was indeed going to that store. Romo-Chavez also told the agent that the previous Saturday he had received an offer to sell the Buick in exchange for a small truck and $2,000 and that he was going to meet the buyer at an Auto-Zone in No-gales to complete the transaction. After Romo-Chavez told Simboli that he had recently had an engine sensor replaced in his car, Simboli asked him about the methamphetamine that had by this time been discovered in his car. Romo-Chavez denied knowledge, and the interview ended.
Agent Simboli testified that he recognized proper nouns such as “Phoenix” and “Dillard’s,” but otherwise depended on Officer Hernandez’s translation. Though Romo-Chavez later claimed not to have understood Officer Hernandez, the record does not indicate that he ever told Hernandez or Simboli at the time that he could not understand the questions.
C
Further examination of the Buick revealed that several gallons of gasoline in its tank had been displaced with almost six kilograms of 99.6% pure methamphetamine. Investigation also showed that *959 Romo-Chavez had a history of crossing the border with Gustavo Vargas-Diaz, a known drug trafficker who had boasted to him that he trafficked in narcotics. Romo-Chavez was charged with knowing possession of methamphetamine with intent to distribute it in violation of 21 U.S.C. § 841(a)(1) and 841(b)(l)(A)(viii) and with importing the substance into the United States in violation of 21 U.S.C. §§ 960(a)(1) and 960(b)(1)(H).
D
At trial, Romo-Chavez’s defense was that he was unaware that the drugs were in his car. He asserted that Vargas-Diaz, who helped him purchase his car and then helped to arrange repairs of the broken sensor, must have surreptitiously installed the secret compartment while the car was in the shop. Romo-Chavez testified that he was going to Phoenix primarily to inquire about enrolling in an online MBA program offered by the University of Phoenix. He said that returning the shirts was only a secondary goal and that he also wished to repair a crack in his windshield. He claimed that he would have been able to corroborate his story using certain personal items located in his car, particularly his cellular telephone, if only the government had preserved them. He attempted to explain away any apparent inconsistencies in his story as a result of Officer Hernandez’s allegedly poor translation.
After a five-day trial, the jury convicted Romo-Chavez on all counts. Romo-Cha-vez timely appeals.
II
On appeal, Romo-Chavez first argues that admission of Agent Simboli’s account of what Romo-Chavez said during the interview on the border violated both the rule against hearsay and the Confrontation Clause. The government counters that because Officer Hernandez served merely as a language conduit, his translations to Officer Simboli should be treated as Romo-Chavez’s own statements.
A
When an out-of-court statement is offered to prove the truth of the matter asserted, it is hearsay and generally inadmissible. Fed.R.Evid. 802. However, a party may introduce the out-of-court statements of his opponent as party admissions. Fed.R.Evid. 801(d)(2). Therefore, Romo-Chavez’s statements were admissible if “the translated statements” made by Officer Hernandez “fairly should be considered the statements” of Romo-Chavez. United States v. Nazemian, 948 F.2d 622, 527 (9th Cir.1991).
Whether statements made through an interpreter should be considered statements of the original declarant “requirefs] an analysis of the facts on a case-by-case basis.” United States v. Garcia, 16 F.3d 341, 342 (9th Cir.1994). Generally, we consider “the following four factors ...: (1) which party supplied the interpreter, (2) whether the interpreter had any motive to mislead or distort, (3) the interpreter’s qualifications and language skill, and (4) whether actions taken subsequent to the conversation were consistent with the statements as translated.” Id. at 342-43 (citation and internal quotation marks omitted).
The first factor weighs slightly in favor of Romo-Chavez. Officer Hernandez was supplied by — indeed was an employee of — the government. But “[t]he fact that [Hernandez] is a government employee does not, by itself, necessarily prevent” his translations from being admissible. United States v. Sanchez-Godinez, 444 F.3d 957, 960 (8th Cir.2006); see also Nazemian, 948 F.2d at 527-28; United States v. Da Silva, 725 F.2d 828, 832 (2d Cir.1983). Though never dispositive, this factor would have greater weight if Officer Hernandez had “acted as both a translator *960 and a federal law enforcement officer,” by “ask[ing] the types of questions he ‘normally would ask’ in his capacity” as a government agent. Sanchez-Godinez, 444 F.3d at 960-61. But while Officer Hernandez did read Romo-Chavez his Miranda rights off a pre-printed card, the record indicates that he did not initiate any of the questions. See id.
The second factor weighs in favor of the government. The district court found that Officer Hernandez had no motive to distort the translation, and Romo-Chavez presents no reason why this finding was clearly erroneous. We do not presume, as Romo-Chavez would have us do, that a public servant is inherently biased. See United States v. Martinez-Gaytan, 213 F.3d 890, 892 (5th Cir.2000); see also Germano v. Int’l Profit Ass’n, 544 F.3d 798, 802-03 (7th Cir.2008); Da Silva, 725 F.2d at 832;[3] cf. United States v. Garcia-Martinez, 228 F.3d 956, 961 (9th Cir.2000).
The third factor, the skill of the translator, also weighs in favor of the government. Whether an individual speaks a foreign language with sufficient fluency to act as a translator in a given situation is a question of fact. Cf. Nazemian, 948 F.2d at 527-28 (treating competence as an issue of fact and evidence). The evidence establishes that Officer Hernandez grew up in El Paso speaking Spanish, studied it in school, spoke it at home with his wife, and conducted interviews in it on a regular basis.
We are unconvinced by Romo-Chavez’s assertion that Hernandez was nonetheless incompetent to translate because he made minor mistakes when asked in court to recite the Miranda warnings from memory. Both Officer Hernandez and Agent Simboli testified that they had never attempted to Mirandize a suspect in any language without the use of a pre-printed form. We are even less persuaded that his difficulties translating the technical aspects of a real estate contract when asked to do so at trial indicate an inability to ask simple questions about an individual’s purpose in coming to the United States. Judge Zapata, who “has a degree in Spanish ... and [has] spoken Spanish [his] entire life,” said that “he could not have translated” the contract. As such, the record fully supports Judge Zapata’s conclusion that Officer Hernandez was competent to translate Romo-Chavez’s answers about “where he was going, where he lived ... those sorts of questions. It’s not very high level Spanish.”[4]
Because Romo-Chavez took no action after the translation, the fourth factor — whether those actions were consistent with the translated statement — is not relevant in this case. When evaluating this factor, we look to objective action rather than a party’s litigation position. See, e.g., Garcia, 16 F.3d at 344 (relying on the delivery of the same amount of drugs discussed by the translator); Nazemian, 948 F.2d at 528 (a series of “repeated, lengthy meetings,” indicating that all parties were content with the quality of the translator). Romo-Chavez’s post hoc, self-serving deni *961 al is insufficient to tip this factor in his favor.
Taking these factors together, the district court did not err in concluding that Officer Hernandez served merely as a language conduit for Romo-Chavez.[5]
B
The Sixth Amendment guarantees a criminal defendant the right “to be confronted with the witnesses against him.” U.S. Const. amend. VI. However, this right is not implicated here because Officer Hernandez’s translations are properly construed as Romo-Chavez’s own statements. Nazemian, 948 F.2d at 525-26. Even if it were, however, it was satisfied by Officer Hernandez’s appearance at trial. He may not have remembered the interview, but “ ‘[t]he Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion.’ ” United States v. Owens, 484 U.S. 554, 558, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988) (quoting Delaware v. Fensterer, 474 U.S. 15, 21-22, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (per curiam)). All the Confrontation Clause requires is the ability to cross-examine the witness about his faulty recollections. Id.; see also Crawford v. Washington, 541 U.S. 36, 59 n. 9, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (“Finally, we reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.”).
Ill
Romo-Chavez next challenges the district court’s refusal to instruct the jury to infer from the government’s destruction of certain personal property that it would have yielded evidence harmful to the government. But to warrant such an instruction, a criminal defendant must establish (1) that the evidence was destroyed in bad faith, and (2) that he was prejudiced by its destruction. United States v. Artero, 121 F.3d 1256, 1259 (9th Cir.1997); United States v. Jennell, 749 F.2d 1302, 1308-09 (9th Cir.1984); accord Arizona v. Youngblood, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); United States v. Laurent, 607 F.3d 895, 902 (1st Cir.2010) (stating that an adverse inference “instruction usually makes sense only where the evidence permits a finding of bad faith destruction; ordinarily, negligent destruction would not support the logical inference that the evidence was favorable to the defendant”); Lunnon v. State, 710 A.2d 197, 199 n. 3 (Del.1998) (adopting a different rule under state law but describing federal rule as a “bright line due process test of police bad faith”).
We acknowledge that our standard in civil cases differs somewhat. But the bad faith requirement, absent from the general civil standard, exists in criminal cases because it “limits the extent of the police’s obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it.” Youngblood, 488 U.S. at 58, 109 S.Ct. 333; see also Illinois v. Fisher, 540 U.S. 544, 547-48, 124 S.Ct. 1200, 157 L.Ed.2d 1060 (2004) (per curiam).
As Romo-Chavez concedes, there was no bad faith shown in this case. Therefore, the district court did not err.
*962 IV
Finally, Romo-Chavez argues that even if he was not prejudiced by any single error, the cumulative effect of multiple errors requires reversal. Because the district court committed no error, Romo-Chavez cannot be entitled to such relief. United States v. Jeremiah, 493 F.3d 1042, 1047 (9th Cir.2007).
AFFIRMED.

. Because Officers Aldrich and Tipling speak Spanish, they did not require the assistance of a translator. Though there was some discussion of their qualifications at trial, Romo-Chavez does not challenge that matter in this appeal.

. Though Romo-Chavez’s attorney collected the currency that he had possessed at the time of his arrest, the majority of the items remained in CBP storage for months. They were eventually destroyed in accordance with routine CBP protocol.

. We note that Romo-Chavez’s only authority for his position is a footnote that we have already discounted. Nazemian, 948 F.2d at 527 (disregarding the language in United States v. Felix-Jerez, 667 F.2d 1297, 1300 n. 1 (9th Cir.1982), as dicta because it created an overly rigid frame of analysis).

. We recognize the concurrence’s concerns about Hernandez’s language abilities, but Judge Zapata was in a far better place to determine what those abilities were than we are reviewing a cold record. Speculation about what "Romo-Chavez actually ... may have” said, post at 965, does not demonstrate that Judge Zapata's factual determination that the officer was capable of translating these statements was clearly erroneous.

. Romo-Chavez’s fallback argument relating to the agents's failure to record is similarly without merit. Whether or not a recording is made has no bearing on whether the translator's statements may be fairly attributed to the defendant. And as we have routinely said, suppression is not warranted simply because the government fails to record an interview. United States v. Smith-Baltiher, 424 F.3d 913, 925-26 (9th Cir.2005).