**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

<table>
<tr><td>

UNITED STATES OF AMERICA,<br>
     *Plaintiff-Appellee*,<br>
<br>
    v.<br>
<br>
TODD RUSSELL FRIES, AKA Todd<br>
Burns,<br>
     *Defendant-Appellant*.

</td><td>

No. 13-10116<br>
<br>
D.C. No.<br>
4:11-cr-01751-<br>
CKJ-CRP-1<br>
<br>
<br>
OPINION

</td></tr>
</table>

Appeal from the United States District Court
for the District of Arizona
Cindy K. Jorgenson, District Judge, Presiding

Argued and Submitted February 11, 2014
Submission Withdrawn and Deferred February 12, 2014
Resubmitted February 13, 2015
San Francisco, California

Filed March 30, 2015

Before: Richard C. Tallman and Johnnie B. Rawlinson,
Circuit Judges, and Marvin J. Garbis, Senior District
Judge.[*]

Opinion by Judge Rawlinson

---

[*] The Honorable Marvin J. Garbis, Senior District Judge for the U.S.
District Court for the District of Maryland, sitting by designation.

**SUMMARY**[**]

**Criminal Law**

The panel affirmed the defendant's convictions and sentence for using a chemical weapon in violation of 18 U.S.C. § 229(a) and making false statements to the FBI in violation of 18 U.S.C. § 1001.

The panel held that the prosecution pursuant to § 229, which was enacted as part of the Chemical Weapons Convention Implementation Act of 1998, was within the federal government's prosecutorial authority, and that Congress has the constitutional authority to proscribe the conduct in which the defendant engaged. The panel wrote that unlike the defendant in *Bond v. United States*, 134 S. Ct. 2014), the defendant did not engage in purely local criminal activity resulting in minor injury to a single individual; rather, his detonation of chlorine bombs requiring the evacuation of an entire neighborhood had "the potential to cause severe harm to many people."

Interpreting the plain language of the statute, the panel held that the district court properly rejected the defendant's requested jury instruction that § 229(c) required the government to prove that defendant's criminal act was against property owned, leased, or used by the United States. The panel explained that the requested instruction was legally untenable because § 229(c) states the jurisdictional elements in the disjunctive.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the district court properly denied the defendant's motion to suppress evidence seized pursuant to a search warrant. The panel wrote that the information supporting probable cause to search was not stale because it was based on the defendant's continuing pattern of criminal conduct, and that the warrant application sufficiently limited the agents' discretion in conducting their search of the defendant's residence, computers, and business records.

The panel held that the district court correctly held that the statements of the defendant's co-participant were admissible pursuant to Fed. R. Evid. 801(d)(2)(E) as co-conspirator statements even though the indictment did not allege a conspiracy count. The panel held that the district court also acted within its discretion in rejecting the defendant's proffered missing evidence instruction as lacking the requisite legal and factual support.

The panel rejected the defendant's contention that application of a two-level obstruction of justice enhancement pursuant to U.S.S.G. § 3C1.1 constituted impermissible double-counting, where the chemical-weapons count and the false-statement count were properly grouped pursuant to U.S.S.G. § 3D1.2, the enhancement was applied to the defendant's conviction for use of chemical weapons, and the defendant's conviction for making a false statement did not fully encompass his obstructive conduct.

**COUNSEL**

Richard C. Bock, Tucson, Arizona, for Plaintiff-Appellant.

John S. Leonardo, United States Attorney, District of Arizona, Robert L. Miskell and Peter D. Sax (argued), Assistant United States Attorneys, Tucson, Arizona, for Defendant-Appellee.

**OPINION**

RAWLINSON, Circuit Judge:

Appellant Todd Russell Fries (Fries) challenges his convictions for using a chemical weapon in violation of 18 U.S.C. § 229(a) and making false statements to the Federal Bureau of Investigation (FBI) in violation of 18 U.S.C. § 1001. Fries contends that Congress exceeded its authority when it passed 18 U.S.C. § 229(a) to criminally enforce provisions of the Chemical Weapons Convention. Relatedly, Fries asserts that the district court erred in rejecting his proffered jury instruction on the jurisdictional requirements of 18 U.S.C. § 229(a).

Fries also maintains that the district court erred in denying his motion to suppress evidence seized at his residence pursuant to a stale and overbroad search warrant. In addition, Fries contends that a new trial is warranted because the district court erred in admitting a co-conspirator's statements, and in rejecting his proffered instruction premised on the FBI's failure to record the phone call serving as the basis for the false statements charge.

Finally, Fries posits that the district court erred in applying a two-level sentencing enhancement for obstruction of justice.  We affirm Fries' convictions and sentence.

## I.  BACKGROUND

### A.  Indictment

Count One of the second superseding indictment alleged that Fries:

> did knowingly develop, produce, and otherwise acquire, transfer directly or indirectly, receive, stockpile, retain, own, possess, use, and threaten to use a chemical weapon, namely a combination of a chlorinated cyanuric acid and an unknown reactive chemical component, which when combined, created airborne toxic chemicals, including chlorine not intended for peaceful purposes, protective purposes, unrelated military purposes or law enforcement purposes as described in 18 U.S.C. § 229F(7), by placing a device on the driveway in front of the garage and on the back porch of [a] residence . . . [i]n violation of 18 U.S.C. §§ 229(a) and 2.

Count Two alleged that Fries "did knowingly and willfully make false, fraudulent, and fictitious material statements and representations, in a matter within the jurisdiction of the Federal Bureau of Investigation" in violation of 18 U.S.C. § 1001(a)(2).  According to the indictment, Fries "while impersonating another individual

(initials M.F.) called the Federal Bureau of Investigation and falsely implicated a third person (initials J.C.N.) for the use of chemical weapons . . . knowing that J.C.N. had no connection to the offense . . . when, in fact, [Fries] was responsible for the use of the chemical weapons."[1]

## B.  Pre-Trial Motions

### 1.  *Motion To Dismiss Counts One and Two of the Indictment*

Fries sought dismissal of Counts One and Two for lack of subject matter jurisdiction.  Fries asserted that the federal government lacked jurisdiction over the alleged conduct because the requisite interstate commerce nexus was absent.  Fries also maintained that he had been charged with "a state court criminal offense, that is miscast as a federal crime. . . ."

The district court rejected Fries' challenge, holding that 18 U.S.C. § 229 "is constitutional pursuant to the federal government's Treaty Power under Article II, § 2 of the United States Constitution in conjunction with the Necessary and Proper Clause, Article I, § 8." (citation omitted).

---

[1] Counts Three and Four charged Fries with the knowing possession of destructive devices that were not registered in the National Firearms Registration and Transfer Record in violation of 18 U.S.C. §§ 5861(d) and 5871.  The district court granted Fries' motion to sever Counts Three and Four.  Fries challenged his conviction on these counts in a separate appeal, No. 13-10654.

## 2. *Motion To Suppress*

In his motion to suppress evidence seized from his residence, Fries maintained that the information supporting the search warrant was impermissibly stale. Fries noted that he was charged with use of a chemical weapon at the residence of a former customer on August 2, 2009, and the search warrant was not sought until May 11, 2011. Fries also attacked the search warrant as overbroad, because the items to be seized included all of Fries' computers and computer equipment, although Fries was not charged with a computer-related offense.

According to the search warrant affidavit, prepared by FBI Special Agent Brian Nowak, Myles and Karen Levine first encountered Fries when they utilized his company to resurface their driveway. The Levines were dissatisfied with the resurfacing and "stopped payment on a check made payable to Fries in the amount of $200.00." Thereafter, on August 2, 2009, the Pima County Sheriff's Department received emergency calls reporting a "strong chemical smell" emanating from a residential area in Tucson, Arizona. "Investigators found a large pile of burning, gas emitting debris in front of the closed garage door at the front of the Levine's [sic] home, and a bucket containing burning, oozing debris on the back patio." "The two burning devices together created a very large, thick plume of grayish, white colored cloud. Spread throughout the front driveway, sidewalk and walkway leading to the front door was a thick, viscous, slimy material, which appeared to be a combination of paint and motor oil, plus foam peanuts." "Also strewn in the front of the home were dead animal carcasses including a rabbit, cat, coyote and numerous woodpeckers." Offensive graffiti was painted on the front of the house, including a swastika. "The

front door, windows and garage door of the Levine's [sic] home were all sealed shut with a foam expanding seal, thereby preventing the Levine's [sic] from escaping through the front of the house."

Special Agent Nowak conveyed that two days after the incident, a person purporting to be Michele Fuentes, contacted the FBI in Tucson professing to have information about the incident. The individual stated that, when she was working for the Levines, Mr. Levine asked her "to engage in sex acts." She declined the request and informed Mrs. Levine. She also stated that the Levines failed to pay her for her cleaning services and that Mrs. Levine threatened to report her to "Immigration Services." Upset with the Levines, Fuentes reportedly informed her cousin Joaquin Contreras-Navarette about the situation. She described Joaquin as an extremely violent person, who had admitted stealing a large amount of chlorine tablets and placing them in buckets around the Levines' residence. Although Fuentes described herself as a Mexican National, she spoke perfect English without an accent. It also appeared to the agent that the caller was a man attempting to sound like a female.

According to Special Agent Brian Nowak, "[a] nearly identical attack occurred [previously] on November 1, 2008." "[M]otor oil, paint, grease, feces, dead animals and foam packing peanuts had been strewn on the driveway leading up to the front door of [the Levine] home . . ." That attack also included offensive and racist graffiti painted on the house and curb area. "A woman's wallet, covered with paint, was found next to the driveway. Inside was a drivers license issued to Kayln Hovey . . . and other personal items." When investigators interviewed Hovey, she identified the drivers'

license and other items as hers, but not the wallet.  Agents confirmed that Hovey's wallet was stolen in October, 2005.

Agent Nowak added that on April 28, 2011, an attack similar to the 2008 and 2009 attacks on the Levines was perpetrated on another of Fries' former customers who was dissatisfied with Fries' work and refused to pay.  Present at the scene was a small black wallet containing business cards and a driver's license.  When Agents interviewed the female whose license was found at the scene, they learned that she had lost her driver's license in December, 2010.

Agent Nowak also related that confidential sources had provided information concerning Fries' frequent use of a laptop and his stockpiling of "buckets, used oil, feces and dead animals at his home for future attacks" similar to those described in the search warrant affidavit.

Based on the information in his affidavit, Agent Nowak sought a search warrant for Fries' residence and for vehicles that Fries utilized in his business.  The items to be seized included "[a]ny written material that describes how to produce, make or manufacture bombs, chemical weapons or destructive devices," as well as Fries' computers and computer equipment.  After the search warrant was executed, Fries filed a motion to suppress the seized evidence.

The magistrate judge recommended denying Fries' motion to suppress.  The magistrate judge concluded that the information supporting the search warrant was not stale, because Fries was alleged to have engaged in a continuing pattern of criminal conduct involving similar incidents of harassment of former customers.  The magistrate judge also

determined that the search warrant was not overbroad and that the good faith exception applied in any event.

The district court adopted the magistrate judge's report and recommendation and denied Fries' motion to suppress. The district court held that the supporting information for the search warrant was not stale because it was premised on three similar incidents in which Fries' "dissatisfied customers . . . found their homes vandalized," and "[a] similar *modus operandi* was used each time. . . ." The district court determined that Fries engaged in a pattern of conduct that continued "until two weeks prior to the date of the search warrant . . ." The district court also opined that the search warrant was reasonably specific because it sufficiently delineated each item to be seized, and that seizure of the delineated items was supported by probable cause.

## C. Trial Testimony and Verdict

Myles Levine testified regarding the details of the incidents that occurred in 2008 and 2009.

Deputy Sheriff Edward Muszala testified that when he responded to the 2008 incident, he observed that the driveway was covered with motor oil and packing peanuts and that there was graffiti on the curb area. The garage door had "additional graffiti" including "spray painting, male and female genitals, plus the swastikas and anarchy sign." Officer Muszala also noticed "a very bad smell of dead animals, and motor oil . . ." As Officer Muszala approached the front door, he observed "a pile of dead animals."

John Bradley, a crime scene specialist, described his discovery of a paint can that contained three latent

fingerprints, one of which belonged to Fries. Bradley also found a driver's license issued to Kayln Hovey in a wallet near the Levines' residence.

As previously noted, although Hovey recognized her driver's license, she conveyed that the wallet did not belong to her. Hovey testified that she was in a car accident in October, 2005, and that when she was in the hospital, her wallet went missing from her purse.

Two days after interviewing Hovey, Officer James Paul described receiving a 911 telephone call from an individual who identified herself as Hovey. Detective Paul did not believe that the person was actually Hovey.

Mr. Levine informed the jury that after the 2008 incident, they moved to a different gated community. On August 2, 2009, Mr. Levine went to sleep at approximately 6:00 p.m. after receiving kidney dialysis. Mr. Levine was awakened by his wife "screaming hysterically . . ." The Levines were unable to "get out the front door" of their residence and called the police. The Levines were also unable to open their garage door. After detecting a chemical smell, the Levines exited their home through the back patio, where they "saw something burning . . ." Mr. Levine also noticed that the front of the residence was "on fire." Mr. Levine was forced to seek medical attention due to the burning in his eyes and throat.

Deputy Kenneth Atwell of the Pima County Sheriff's Department testified that in 2009 he responded to a "public hazard call" describing "a chemical pool smell, chlorine smell in the air . . ." When he approached the area in his vehicle, Deputy Atwell noticed a strong chemical smell even though

the windows of his vehicle were closed. Deputy Atwell subsequently received "a criminal damage call" at the Levines' residence. When Deputy Atwell arrived, he noticed "graffiti all over the garage, on the walls . . . expanding foam sealant around the garage, a big bucket, like a chlorine bucket in the driveway [and] foam peanuts all over the whole front of the yard and the walkway and everywhere in the front." The bucket in the front driveway was "popping and oozing" and emitting smoke. When Deputy Atwell went to the back of the residence, Mrs. Levine opened the back door and screamed for help. As Deputy Atwell approached a small fence at the back of the residence, he noticed another bucket in the backyard that was "oozing and [ ] popping" with "a little smoke trail . . . very scary looking." While he was assisting the Levines over a wall in the back of their residence, Deputy Atwell observed "a massive grayish-yellow-white cloud" near the front of the residence. Deputy Atwell subsequently donned a gas mask and assisted with evacuating the entire neighborhood.

Deputy Christopher McCracken of the Pima County Sheriff's Department also responded to the 2009 incident. Deputy McCracken observed "a very dark cloud" at the front of the residence that "was increasing in size dramatically." He also noticed that the cloud had covered the entire cul de sac and that there was a "very strong, chlorine smell." Deputy McCracken donned a gas mask and also assisted in evacuating the neighborhood. During the evacuation, Deputy McCracken suffered irritation to his eyes, nose, and throat.

Sergeant Stephen Carpenter of the Pima County Sheriff's Department observed "a cloud of an enormous proportion that basically had enclosed and enveloped [the] whole area" near the Levines' residence. From an elevated position, Sergeant

Carpenter observed that the cloud was "moving slowly" and spreading into other parts of the neighborhood. When Sergeant Carpenter approached the area near the Levines' residence, his "throat started to burn, [his] eyes burned. The skin on [his] face burned," and he experienced difficulty breathing.

Bert Rucker, who was a member of the fire district's hazardous material unit, was dispatched to the Levines' residence. Rucker stopped before reaching the Levines' home because he observed a dense cloud that "was approximately 30 feet high, 40 feet wide, and several hundred feet long, and hanging close to the ground." Rucker related that, after he observed on the back porch "a large five-gallon bucket that was fuming," his captain "initiated . . . a HAZMAT alarm" for additional emergency resources, including a battalion chief, a safety officer, "two or three more fire engines," and a "hazardous materials truck . . ."

Levi Cranford, a firefighter, accompanied Rucker to the Levines' residence. Cranford observed a chlorine bucket that was still smoking at the back of the Levines' home. Approximately two hours after being dispatched, Cranford donned a protective suit that prevented "any exposure . . . to the outside atmosphere" and entered the back of the Levines' residence to take samples. Cranford related that his testing equipment did not register any chlorine readings inside the house. However, when he entered the garage, the alarms on his equipment for chlorine gas went off. The alarm "meant . . . that the environment . . . was higher than the recommended level that any person should be in outside of a Level A suit."

Sergeant Christopher Rogers, a bomb technician with the Pima County Sheriff's Department, was also dispatched. Utilizing a robot with chemical detection equipment, Sergeant Rogers confirmed the positive reading for chlorine near the Levines' garage. According to Sergeant Rogers, the use of a sealed chlorine bucket intensified the dispersion of chlorine gas as the bucket exploded. Sergeant Rogers observed that the "multiple five-gallon containers" had "the great potential to cause serious physical injury or death."

Battalion Chief Heath Evans tracked the chemical cloud and described it as approximately "1,000 feet long, 100 feet high, and roughly 200 feet deep." There was no visibility through the cloud. It was "one big solid mass . . . [that] was just kind of hanging over the neighborhood." Chief Evans tracked the cloud for "roughly an hour" until "it ended up in the Santa Cruz River about three and a half miles away."

Dr. Frank Walter, a medical toxicologist and emergency medical physician, testified that chlorine gas is toxic and qualifies as a chemical that may be immediately dangerous to life and health at certain levels.

Detective Alexander Tisch testified that he found a black day planner near the Levines' residence. The day planner contained a driver's license for Michele Fuentes, business cards for Debbie's Cleaning Service, and a check from Fuentes made out to Karen Levine with a notation "refund customer unhappy." Fries' latent fingerprint was found on the check.

On August 4, 2009, FBI Agent Jon Edwards, the complaint duty agent for the FBI's Tucson office, received an "unusual phone call" from "a male trying to impersonate a

female voice." Although Agent Edwards attempted to record the call, "[t]he recording volume was turned all the way off to zero, so the recording was essentially ineffective." The caller identified himself as "Michelle [sic] Fuentes" and stated that he had information concerning the incident at the Levines' residence. The caller stated that Mr. Levine had approached Fuentes in "a sexual manner," and Mrs. Levine "threatened to call Immigration" when Fuentes reported Mr. Levine's conduct to her. The caller stated that her cousin, Joaquin Contreras-Navarette, was responsible for the chlorine attack on the Levines' residence.

Agent Edwards traced the call to a Tucson hospital. A nurse at the hospital informed FBI agents that she had noticed an unauthorized individual on the floor from which the phone call was made. The FBI agents showed the nurse a photograph of Fries' driver's license and the nurse identified Fries as the man she saw in the hospital. Fries' latent fingerprint was also found on the hospital telephone.

Fuentes testified that, in 2007, her purse was stolen while she was attending college. The purse contained her driver's license, social security card, checks, and a day planner. Fuentes related that the check found at the Levines' residence was not in her handwriting. Fuentes did not know anyone with the name "Joaquin Navarette" and she had never worked for a cleaning service.

Edward Trujillo testified that he worked for Fries from 2006 to 2008. Trujillo related that Fries was "very upset" when a check from the Levines was cancelled. Fries told Trujillo that "he wanted to make [the Levines] pay for not paying him." According to Trujillo, Fries "started collecting materials" including motor oil to pour on the Levines'

driveway. Fries asked his employees "to defecate in buckets so he could use it for the Levine's [sic] driveway, also." Fries showed Trujillo "road kill" Fries had collected, including a coyote. Fries informed Trujillo that "[h]e wanted to pour oil all over the [Levines'] driveway and . . . spray paint on the house itself and put dead animals around the windows." Fries referred to his plans as "the Levine project." According to Trujillo, Fries called the Levines and thanked them for their payment so the Levines would not suspect him of the vandalism.

Austreberto Montiel testified that he worked for Fries from 2006 to 2009. Montiel confirmed that Fries was upset that the Levines had not fully paid him. Fries asked Montiel and other workers to collect motor oil and dead animals to place at the Levines' residence. Montiel had a conversation with Dan Jordan about "road kill" and that Fries instructed Jordan to collect a dead coyote from the road. Fries offered Montiel $100 to participate in the vandalism at the Levines' residence, but Montiel declined. Montiel conveyed that Jordan and Fries discussed vandalizing the Levines' home on Halloween night.

After vandalizing the Levines' home, Fries told Montiel that he had spray painted the Levines' residence with swastikas and "[s]omething about Jews" so that the appearance of a hate crime would divert the investigation. Fries also informed Montiel that he had left someone else's identification at the residence "to throw off the investigation."

At the conclusion of the trial, the jury convicted Fries of Counts One and Two of the indictment.

**D. Sentencing**

The total offense level for Fries' offense was 34. A two-level enhancement for obstruction of justice was recommended because Fries "willfully obstructed or attempted to obstruct the administration of justice by impersonating another individual during a telephone call to authorities about the instant offense, knowing the individual had no involvement in the matter." An obstruction of justice enhancement was also recommended because Fries "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to [Fries'] offense of conviction and relevant conduct; or a closely related offense . . ."

Fries objected to imposition of an enhancement for obstruction of justice. Fries maintained that the enhancement constituted improper double-counting because the substantive offense alleged in Count Two of the indictment was also premised on Fries' phone call to the FBI.

The district court overruled Fries' objection to the obstruction of justice enhancement. The district court held that the enhancement was warranted irrespective of Fries' false statement conviction due to Fries' obstruction of the investigation.

The district court adopted the presentence report and calculated a base offense level of 28 and an adjusted offense level of 34, with a criminal history category of one. The corresponding Sentencing Guidelines range was 151 to 188 months and the district court sentenced Fries to "151 months

on Count 1, and 60 months on Count 2 to run concurrently." Fries filed a timely notice of appeal.

## II. STANDARDS OF REVIEW

"We review de novo the constitutionality of a statute." *United States v. Chovan*, 735 F.3d 1127, 1131 (9th Cir. 2013) (citation omitted). "We also review de novo constitutional challenges to a district court's denial of a motion to dismiss." *Id.* (citation omitted).

"We review the district court's denial of a motion to suppress *de novo*." *United States v. Arreguin*, 735 F.3d 1168, 1174 (9th Cir. 2013) (citation omitted). "We review the district court's factual findings underlying the denial for clear error . . ." *Id.* (citation omitted).

"We review evidentiary rulings for abuse of discretion, though we review de novo the district court's interpretation of the Federal Rules of Evidence." *United States v. Kahre*, 737 F.3d 554, 565 (9th Cir. 2013) (citation and alteration omitted).

"We review the language and formulation of a jury instruction for an abuse of discretion. However, when jury instructions are challenged as misstatements of law, we review them *de novo*." *United States v. Cortes*, 757 F.3d 850, 857 (9th Cir. 2014), *as amended* (citations, alteration, and internal quotation marks omitted).

"We review a district court's refusal to give an adverse inference instruction, when properly raised by the appellant, for abuse of discretion. . . ." *United States v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir. 2013) (citation omitted).

"We review the district court's interpretation of the Sentencing Guidelines *de novo* and its factual findings for clear error. . . ." *United States v. Huang*, 687 F.3d 1197, 1202 (9th Cir. 2012) (citation omitted).

## III.   DISCUSSION

### A.  Jurisdictional Challenge

Fries contends that the district court erred in denying his motion to dismiss the indictment for lack of federal jurisdiction.  Fries asserts that the government improperly applied 18 U.S.C. § 229(a) to Fries' crimes against another person's private property.[2]

18 U.S.C. § 229 was enacted as part of the Chemical Weapons Convention Implementation Act of 1998.  *See Bond v. United States*, 134 S. Ct. 2077, 2083, 2085 (2014).  The Chemical Weapons Convention evolved from a consensus in the international community after World War I that the use of chemical weapons should be forever banned.  *See id.* at 2083. The resulting 1925 Geneva Protocol prohibited the use of chemicals as weapons of war.  *See id.*  Unfortunately, the Geneva Protocol did not curb the use of chemical weapons as envisioned.  Thus, the international community reconvened

---

[2] Pursuant to 18 U.S.C. § 229(a) (1998):

> it shall be unlawful for any person knowingly– (1) to develop, produce, otherwise acquire, transfer directly or indirectly, receive, stockpile, retain, own, possess, or use, or threaten to use, any chemical weapon; or (2) to assist or induce, in any way, any person to violate paragraph (1), or to attempt or conspire to violate paragraph (1).

"to update the Geneva Protocol's protections and to expand the prohibition on chemical weapons beyond state actors in wartime. . . ." *Id.* at 2084 (citation omitted). Because the Convention was not self-executing, legislative action was required to implement the provisions of the Convention in this country. *See* United Nations Convention on the Prohibition of the Development, Production, Stockpiling, and Use of Chemical Weapons and on their Destruction, art. 7(1), Jan. 13, 1993, 32 I.L.M. 800, 810, *available at* 1993 WL 720503 ("Each State Party shall, in accordance with its constitutional processes, adopt the necessary measures to implement its obligations under this Convention . . .").

Congress executed the provisions of the Convention by enacting 18 U.S.C. § 229. As noted by the Supreme Court, the provisions of § 229 track the Convention provisions. *See Bond*, 134 S. Ct. at 2085. The Convention prohibits each State Party from developing, producing, acquiring, stockpiling, retaining, transferring or using chemical weapons. *See* Convention, art. 1(1)(a), (b), 32 I.L.M. at 804; *cf.* 18 U.S.C. § 229(a)(1). Chemical weapons are defined in the Convention as "[t]oxic chemicals and their precursors . . ." Convention, art. 2(1)(a), 32 I.L.M. at 804; *cf.* 18 U.S.C. § 229F. In turn, a toxic chemical is defined as "[a]ny chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals. . . ." *See* Convention, art. 2(2), 32 I.L.M. at 805; *cf.* 18 U.S.C. § 229F.

In *United States v. Bond*, 681 F.3d 149, 151 (3d Cir. 2012), *rev'd sub nom. Bond v. United States*, 134 S. Ct. 2077 (2014), the Third Circuit affirmed the defendant's conviction under 18 U.S.C. § 229. The defendant, an employee of a chemical manufacturer, sought revenge upon a romantic rival.

*See id.* Bond acquired "highly toxic chemicals, stealing 10–chlorophenoxarsine from her employer and purchasing potassium dichromate over the Internet." *Id.* "She then applied those chemicals to [the victim's] mailbox, car door handles, and house doorknob. . . ." *Id.*

Relying on *Missouri v. Holland*, 252 U.S. 416 (1920), the Third Circuit rejected Bond's argument that "neither the Commerce Clause, nor the Necessary and Proper Clause in connection with the Treaty Power, could support the expansive wording of the statute, let alone her prosecution. . . ." *Id.* (citation omitted).[3] The Third Circuit observed that it was "bound to take at face value the Supreme Court's statement [in *Holland*] that if the treaty is valid there can be no dispute about the validity of the statute as a necessary and proper means to execute the powers of the Government. . . ." *Id.* at 162 (citation, alteration, and internal quotation marks omitted). The Third Circuit opined that "because the [Chemical Weapons] Convention falls comfortably within the Treaty Power's traditional subject matter limitation, the Act is within the constitutional powers of the federal government under the Necessary and Proper Clause and the Treaty Power, unless it somehow goes beyond the Convention. . . ." *Id.* at 165. The Third Circuit concluded

---

[3] In *Holland*, the Supreme Court rejected Missouri's Tenth Amendment challenge to the federal government's enforcement of the Migratory Bird Treaty Act. *See Holland*, 252 U.S. at 430–31, 435. The Supreme Court held that "[a]s most of the laws of the United States are carried out within the States and as many of them deal with matters which in the silence of such laws the State might regulate, such general grounds are not enough to support Missouri's claim." *Id.* at 434. "Valid treaties . . . are as binding within the territorial limits of the States as they are elsewhere throughout the dominion of the United States. . . ." *Id.* (citation and internal quotation marks omitted).

that "because the Convention pertains to the proliferation and use of chemical weapons, which are matters plainly relating to war and peace, we think it clear that the Convention falls within the Treaty Power's core. . . ." *Id.* at 166 (citation omitted).

We agree and adopt the Third Circuit's reasoning in upholding the constitutionality of § 229. In doing so, we acknowledge that the Supreme Court, overturning Bond's conviction on narrower grounds, did not need to address the statute's constitutionality. Because Fries squarely raised the issue on appeal, and we conclude that the statute applies to his conduct, we are required to decide the issue of the statute's constitutionality.

In *Bond*, the Supreme Court considered whether § 229 "reaches a purely local crime: an amateur attempt by a jilted wife to injure her husband's lover, which ended up causing only a minor thumb burn readily treated by rinsing with water. . . ." *Bond*, 134 S. Ct. at 2083. The Supreme Court declined to consider the constitutionality of § 229, but held that the statute was inapplicable to Bond's conduct. *See id.* at 2087. The Supreme Court observed that "in this curious case, we can insist on a clear indication that Congress meant to reach purely local crimes, before interpreting the statute's expansive language in a way that intrudes on the police power of the States." *Id.* at 2090 (citation and footnote reference omitted). The Supreme Court explained that "[c]hemical weapon is the key term that defines the statute's reach, and it is defined extremely broadly. But that general definition does not constitute a clear statement that Congress meant the statute to reach local criminal conduct." *Id.* (internal quotation marks omitted). Instead, "[t]he natural meaning of chemical weapon takes account of both the particular

chemicals that the defendant used and the circumstances in which she used them." *Id.* (internal quotation marks omitted). The Supreme Court cautioned that, speaking naturally, Bond's conduct could not be fairly described as combat. *See id.* Indeed, none of the circumstances of the crime, including the infliction of only "a minor thumb burn" suggested deployment of a chemical weapon. *Id.* at 2090–91. The Court clarified that the chemical compounds "might be chemical weapons if used, say, to poison a city's water supply. But Bond's crime is worlds apart from such hypotheticals, and covering it would give the statute a reach exceeding the ordinary meaning of the words Congress wrote." *Id.* at 2091. The Supreme Court described the *Bond* case as "unusual," and calling for limited analysis. *Id.* at 2093. The Court concluded that this "exceptional convergence of factors gives us serious reason to doubt the Government's expansive reading of section 229, and calls for us to interpret the statute more narrowly." *Id.*

Notably, the Supreme Court observed that "with the exception of this unusual case, the Federal Government itself has not looked to section 229 to reach purely local crimes. The Government has identified only a handful of prosecutions that have been brought under this section." *Id.* at 2092 (citation omitted). "Most of those involved either terrorist plots or the possession of extremely dangerous substances with the potential to cause severe harm to many people." *Id.* (citations omitted). Citing specifically to Fries' prosecution in which Fries "set off a homemade chlorine bomb in the victim's driveway, requiring evacuation of a residential neighborhood," the Supreme Court reasoned:

> The Federal Government undoubtedly has a substantial interest in enforcing criminal laws

against assassination, terrorism, and acts with the potential to cause mass suffering. Those crimes have not traditionally been left predominantly to the States, and nothing we have said here will disrupt the Government's authority to prosecute such offenses.

*Id.*

In view of the Supreme Court's acknowledgment of the government's authority to prosecute Fries' criminal conduct despite its narrow interpretation of § 229, we conclude that Fries' conviction is entirely distinguishable from prosecution of the purely local crime at issue in *Bond*. *See id.* at 2087. The evidence presented at Fries' trial belies any notion that Fries was involved in purely local criminal activity. As contrasted with the "minor thumb burn readily treated by rinsing with water" in *Bond*, 134 S. Ct. at 2083, Fries' use of a chlorine bomb produced a dense chlorine gas cloud estimated to have been "1,000 feet long, 100 feet high, and roughly 200 feet deep" that injured several people including first responders, and required the evacuation of an entire neighborhood and implementation of HAZMAT procedures. Fries' conduct constituted "possession of extremely dangerous substances with the potential to cause severe harm to many people." *Id.* at 2092 (citations omitted). Our conclusion is consistent with Dr. Walter's testimony that chlorine gas is toxic and qualifies as a chemical that is immediately dangerous to life and health. Moreover, Sergeant Rogers testified that Fries' utilization of multiple sealed chlorine containers had "the great potential to cause serious physical injury or death" based on the intensity of the explosions and widespread dispersion of chlorine gas. Thus, the federal prosecution of Fries' criminal use of chlorine gas

in violation of § 229 was entirely proper because "[t]he Federal Government undoubtedly has a substantial interest in enforcing criminal laws against . . . acts with the potential to cause mass suffering. . . ." *Bond*, 134 S. Ct. at 2092. Taking account of the chemicals used by Fries and the circumstances under which he used them, *see id.* at 2090, we conclude that § 229 applies to Fries' criminal conduct, and is a constitutional exercise of congressional authority.

## B.  Challenged Jury Instruction (18 U.S.C. § 229)

As part and parcel of his jurisdictional challenge, Fries requested a jury instruction containing a requirement that the charged criminal act be committed against property owned, leased, or used by the United States to confer jurisdiction under § 229(a).

Pursuant to 18 U.S.C. § 229(c):

> Conduct prohibited by subsection (a) is within the jurisdiction of the United States if the prohibited conduct– (1) takes place in the United States; (2) takes place outside of the United States and is committed by a national of the United States; (3) is committed against a national of the United States while the national is outside the United States; *or* (4) is committed against any property that is owned, leased, or used by the United States or by any department or agency of the United States, whether the property is within or outside the United States.

(emphasis added).

According to Fries, because only one of the subsections of § 229(c) applies to property damage, that subsection must be relied upon to confer jurisdiction over this case. We disagree. Fries' requested instruction was legally untenable because 18 U.S.C. § 229(c) sets forth the jurisdictional provisions in the disjunctive and the government was not required to satisfy each jurisdictional clause. *See United States v. Sheldon*, 755 F.3d 1047, 1050 (9th Cir. 2014) (holding that "Congress's use of the word 'or' at the beginning of the final clause indicates that these are three independent alternatives" and that "[i]n construing a statute, a court should interpret subsections written in the disjunctive as setting out separate and distinct alternatives") (citation omitted). Fries' resort to the rule of statutory construction that a more specific provision controls over a more general provision does not carry the day. We apply rules of statutory interpretation only when assistance is needed to tease out the meaning of ambiguous legislation. *See Woods v. Carey*, 722 F.3d 1177, 1180–81 (9th Cir. 2013). In this case, the statute is clear and unambiguous, conferring jurisdiction upon the court if any one of the distinct jurisdictional alternatives is satisfied. *See Sheldon*, 755 F.3d at 1050. The district court, therefore, properly rejected Fries' requested instruction.

## C. Motion To Suppress

Now that we have determined that § 229 was properly applied to Fries' criminal conduct, we address Fries' motion to suppress evidence seized pursuant to the search warrant. Fries' challenge premised on the staleness of the search warrant is unavailing. "Probable cause for a search requires a fair probability that contraband or evidence of a crime will be found in a particular place, based on the totality of the

circumstances." *United States v. Grant*, 682 F.3d 827, 832 (9th Cir. 2012) (citation and internal quotation marks omitted). "The most convincing proof that the property was in the possession of the person or upon the premises at some remote time in the past will not justify a present invasion of privacy. . . ." *Id.* (citation omitted). However, "[i]nformation underlying a warrant is not stale if there is sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises. . . ." *United States v. Schesso*, 730 F.3d 1040, 1047 (9th Cir. 2013) (citation and internal quotation marks omitted).

We conclude that Fries' "continuing pattern" of vandalizing the homes of former customers militates against a finding that the information supporting probable cause was impermissibly stale. *Id.* Agent Nowak's affidavit delineated in great detail the similarities among the three incidents of vandalism in 2008, 2009, and 2011. Notably, the alleged *modus operandi* for each of the incidents was nearly identical. In particular, each incident involved the use of motor oil, animal carcasses, and other substances to vandalize the former customers' residences, as well as attempts to divert blame to uninvolved individuals. Although Fries attempts to distinguish the 2011 incident as an act of vandalism rather than a federal crime involving the use of chemicals, a pattern of conduct is readily discerned from consideration of the related incidents. This continuing pattern of criminal conduct, as well as the evidence of Fries' stockpiling of items for future acts of retribution, supports an inference that Fries continued to possess items related to ongoing criminal conduct. *See United States v. Crews*, 502 F.3d 1130, 1140 (9th Cir. 2007) ("One may infer that equipment acquired to accomplish a crime will be kept for some period of time. . . .") (citation omitted). The search warrant was issued

approximately two weeks after the April 28, 2011, incident, thus further undermining Fries' staleness argument. *See United States v. Lacy*, 119 F.3d 742, 745 (9th Cir. 1997) (underscoring the relationship between the timing of the relevant conduct and issuance of the warrant).

Fries' argument that the search warrant was impermissibly overbroad in permitting a search of Fries' computers and business records is similarly unpersuasive. "The Fourth Amendment requires that a warrant particularly describe both the place to be searched and the person or things to be seized." *United States v. Smith*, 424 F.3d 992, 1004 (9th Cir. 2005) (citation and emphasis omitted). "The description must be specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized. The purpose of the breadth requirement is to limit the scope of the warrant by the probable cause on which the warrant is based. . . ." *Id.* (citations, alteration, and internal quotation marks omitted).

In this case, the search warrant sufficiently circumscribed the agents' discretion with respect to Fries' computers and records. The search warrant affidavit sufficiently explained that seizure of Fries' computers was required because of the difficulty in analyzing the computers on-site and the potential for alteration or destruction of the computers' components. According to Agent Nowak, a confidential source revealed that Fries had "a laptop that he carries with him at all times and uses frequently" and that Fries "has a computer at his home that he uses very frequently . . ." Additionally, Agent Nowak delineated in great detail that Fries' alleged criminal conduct and the corresponding probable cause stemmed from Fries' harassment of former business customers. *See United States v. Banks*, 556 F.3d 967, 973 (9th Cir. 2009) (upholding

a search under similar circumstances). As a result, the search warrant was not impermissibly overbroad. *See Kahre*, 737 F.3d at 567 (holding that "[t]he search warrant affidavits furnished probable cause to search for the enumerated items").

### D. Co-Conspirator Statements

Fries contends that the district court erred in admitting statements pursuant to Fed. R. Evid. 801(d)(2)(E) that were made by Jordan, an employee and co-participant. Fries argues that the statements were not admissible as non-hearsay testimony because the indictment did not contain a conspiracy count.

Fed. R. Evid. 801(d)(2)(E) (2011) provides:

> A statement that meets the following conditions is not hearsay: The statement is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy.

Contrary to Fries' assertion, we have held that, under Fed. R. Evid. 801(d)(2)(E), "[a] coconspirator's statement is admissible upon proof that it was made in furtherance of a conspiracy, notwithstanding the fact that the indictment does not contain a conspiracy count. The question is merely whether there was proof of a sufficient concert of action to show the individuals to have been engaged in a joint venture. . . ." *United States v. Manning*, 56 F.3d 1188, 1197 (9th Cir. 1995) (citation omitted); *see also United States v. Gonzalez*, 715 F.2d 1411, 1412 (9th Cir. 1983) (holding that "[i]t is clear that statements of a co-defendant are admissible

even in the absence of a conspiracy count where there is independent evidence of a concert of action") (citations, alteration, and internal quotation marks omitted). Because the trial testimony reflected that Jordan conspired in Fries' criminal acts, the district court did not err in admitting the statements attributable to Jordan as a co-conspirator. *See id.*

In any event, any error was harmless given the overwhelming evidence of Fries' guilt, irrespective of Jordan's statements. *See United States v. Morales*, 720 F.3d 1194, 1199 (9th Cir. 2013) (applying the harmless error doctrine).[4]

### E. Challenged Jury Instruction (Missing Evidence)

Fries contends that the district court erroneously rejected his proffered jury instruction premised on the government's failure to record the telephone call that prompted the false statement charge.

Fries proffered the following instruction:

> Ladies and gentleman of the jury the phone call that forms the basis [sic] count two, which you must consider in your deliberation was not recorded by the FBI and will not be available for you during your deliberation.

---

[4] To the extent Fries asserts a Confrontation Clause violation, we are similarly unpersuaded. *See United States v. Grasso*, 724 F.3d 1077, 1085 n.9 (9th Cir. 2013) (rejecting Confrontation Clause challenge because "[a]lthough the Sixth Amendment limits the admissibility of testimonial evidence, co-conspirator statements in furtherance of a conspiracy are not testimonial") (citations omitted).

The district court rejected Fries' proffered instruction because the case did not involve failure to preserve existing evidence or the destruction of evidence. However, the district court permitted Fries to argue that the government's failure to record the call resulted in insufficient evidence to convict him on Count Two.

To warrant a missing evidence instruction, a criminal defendant must establish that evidence was lost or destroyed in bad faith, and he suffered prejudice as a result. *See United States v. Romo-Chavez*, 681 F.3d 955, 961 (9th Cir. 2012). Under this standard, the district court properly rejected Fries' proffered instruction because no evidence was lost or destroyed. Instead, the FBI agent merely failed to record the telephone call. Under Fries' theory, a similar instruction would be warranted whenever law enforcement officials failed to record a statement, or experienced technical difficulties during a recording session. Fries has failed to provide any legal support for this proposition and we are aware of none. *Cf. id.* (explaining that an instruction permitting the jury to draw an adverse inference against the prosecution "usually makes sense only where the evidence permits a finding of bad faith destruction; ordinarily, *negligent* destruction would not support the logical inference that the evidence was favorable to the defendant") (citation omitted) (emphasis in the original).

Fries' reliance on our decision in *Sivilla* is misplaced. In *Sivilla*, the defendant was charged after cocaine was found in the jeep he was driving. *See Sivilla*, 714 F.3d at 1170. Prior to trial, the district court ordered the government to preserve the vehicle as evidence. *See id.* Despite the order, the vehicle was auctioned and "stripped for parts." *Id.* at 1171. The defendant had "sought to use his inspection of the Jeep

to rebut the prosecution's argument that he must have known that the drugs were in the Jeep because of how long and involved a process it was to remove them from the car. . . ." *Id.* at 1174. We distinguished between dismissal of a case due to bad faith destruction of evidence and the giving of a remedial instruction when evidence is destroyed but no bad faith exists. *See id.* at 1170. We opined that "[b]ad faith is the wrong legal standard for a remedial jury instruction. . . ." *Id.* at 1173. Instead, "[c]ourts must balance the quality of the Government's conduct against the degree of prejudice to the accused, where the government bears the burden of justifying its conduct and the accused of demonstrating prejudice." *Id.* (citation and internal quotation marks omitted). Under that standard, we held that a remedial jury instruction was warranted based on the government's destruction of evidence that may have been pivotal to the defense.[5] *See id.* at 1173–74.

In stark contrast, Fries' prosecution did not involve evidence that was lost or destroyed. Even under our reasoning in *Sivilla*, the government's conduct in failing to record the telephone call did not warrant a remedial instruction. The most obvious difference between this case and *Sivilla* is that in *Sivilla* evidence was destroyed in direct violation of a court order. *See id.* at 1170–71. In addition, unlike in this case, Sivilla specified how the destroyed evidence would have been used by the defense. *See id.* at 1174. Finally, in *Sivilla*, because the district court found a lack of bad faith, it declined to give a remedial instruction, and it does not appear that Sivilla was allowed to press the

---

[5] The government suggests that *Romo-Chavez* and *Sivilla* are in tension with respect to application of the bad faith standard. We need not resolve any conflict because Fries' challenge fails under either standard.

destruction of evidence point during trial. *See id.* at 1172–73. In this case, Fries was permitted to argue insufficient evidence due to the failure to record the telephone call. For these reasons, we are persuaded that the district court committed no error.

### F.  Obstruction of Justice Enhancement

Fries asserts that the district court erred in applying a two-level obstruction of justice enhancement pursuant to U.S.S.G. § 3C1.1 based on Fries' August 4, 2009, phone call to the FBI giving false information regarding the attack on the Levines. Fries maintains that the district court engaged in impermissible double-counting because his conduct was also "charged and punished as a substantive offense."

Pursuant to U.S.S.G. § 3C1.1:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1 (2012).[6]

"Impermissible double counting occurs when one part of the Guidelines is applied to increase a defendant's

---

[6] The 2012 Guidelines Manual was utilized for Fries' sentencing.

punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." *United States v. Gallegos*, 613 F.3d 1211, 1216 (9th Cir. 2010) (citation omitted). "But it is not always impermissible to enhance . . . the base offense level multiple times for the same criminal act: It is sometimes authorized and intended by the Sentencing Guidelines when each invocation of the behavior serves a unique purpose under the Guidelines." *Id.* (citation, alteration, and internal quotation marks omitted).

Fries' base offense level was calculated premised on his conviction for Count One of the indictment, the chemical weapons charge. His false statement conviction on Count Two was grouped with Count One in accordance with U.S.S.G. § 3D1.2(c). *See* Application Note 8, U.S.S.G. § 3C1.1 (2012) ("If the defendant is convicted both of an obstruction offense . . . and an underlying offense (the offense with respect to which the obstructive conduct occurred), the count for the obstruction offense will be grouped with the count for the underlying offense under subsection (c) of § 3D1.2 (Groups of Closely Related Counts). The offense level for that group of closely related counts will be the offense level for the underlying offense increased by the 2-level adjustment specified by this section, or the offense level for the obstruction offense, whichever is greater.").[7]

---

[7] Although we have not extensively addressed double-counting relative to an obstruction of justice enhancement, other courts have rejected analogous challenges. *See United States v. Yielding*, 657 F.3d 688, 717 (8th Cir. 2011) (observing that grouping "is designed to prevent double-counting by ensuring that the obstructive conduct is taken into account only once: as a two-level adjustment to the base offense level for the underlying offense, or as the offense level provided for the obstruction offense itself") (citation omitted); *see also United States v. Fiore*,

Moreover, the obstruction of justice enhancement was not limited to the false statement offense alleged in Count Two of the indictment. Rather, the evidence at trial reflected that Fries' attempts to obstruct the investigation extended well beyond the telephone call to the FBI, such as leaving the identifications of other individuals at the Levines' residence to divert attention and thwart the ensuing investigation. Because Fries' conviction for making a false statement did not fully encompass his obstructive conduct, the enhancement was justified. *See United States v. Albritton*, 622 F.3d 1104, 1108 n.4 (9th Cir. 2010) ("Double counting is permissible if it accounts for more than one type of harm caused by the defendant's conduct, or where each enhancement of the defendant's sentence serves a unique purpose under the guidelines.") (citation omitted); *see also United States v. Cabaccang*, 481 F.3d 1176, 1186 (9th Cir. 2007) ("There is . . . nothing wrong with double counting when it is necessary to make the defendant's sentence reflect the full extent of the wrongfulness of his conduct.") (citation and internal quotation marks omitted). The district court, therefore, did not err in applying the obstruction of justice enhancement.

---

381 F.3d 89, 95 (2d Cir. 2004) (holding that "this [grouping] formula ensures the two-point enhancement does not constitute double-counting because when closely related counts are grouped under section 3D1.2(c), the offense level used is that for the most serious counts") (citation, alterations, and internal quotation marks omitted); *United States v. Maggi*, 44 F.3d 478, 482 (7th Cir. 1995) (rejecting the "implication that the enhancement somehow imposed duplicative punishment for . . . obstructive conduct. The enhancement is used merely to determine the applicable Guidelines range") (citation omitted).

## IV.     CONCLUSION

Taking our cue from the Supreme Court's decision in *Bond*, we conclude that the prosecution of Fries pursuant to 18 U.S.C. § 229 was within the federal government's prosecutorial authority.  We also hold that Congress has the constitutional authority to proscribe the conduct in which Fries engaged.  Unlike the defendant in *Bond*, Fries did not engage in purely local criminal activity resulting in minor injury to a single individual.  Rather, his detonation of chlorine bombs requiring the evacuation of an entire neighborhood had "the potential to cause severe harm to many people."  *Bond*, 134 S. Ct. at 2092 (citation omitted).

Interpreting the plain language of the statute, the district court properly rejected Fries' requested jury instruction that § 229(c) required the government to prove that Fries' criminal act was against property owned, leased, or used by the United States.  The requested instruction was legally untenable because § 229(c) states the jurisdictional elements in the disjunctive.

The district court properly denied Fries' motion to suppress evidence seized as the result of a search warrant. The information supporting probable cause to search was not stale because it was based on Fries' continuing pattern of criminal conduct.  The search warrant application sufficiently limited the agents' discretion in conducting their search of Fries' residence, computers, and business records.

Consistent with our precedent, the district court correctly held that the statements of Fries' co-participant were admissible pursuant to Fed. R. Evid. 801(d)(2)(E) as co-conspirator statements even though the indictment did not

allege a conspiracy count.  The district court also acted within its discretion in rejecting Fries' proffered missing evidence instruction as lacking the requisite legal and factual support.

Finally, the district court did not err in applying a two-level obstruction of justice enhancement because Counts One and Two were properly grouped pursuant to U.S.S.G. § 3D1.2 and the enhancement was applied to Fries' conviction for use of chemical weapons.  Fries' conviction for making a false statement did not fully encompass Fries' obstructive conduct.

**AFFIRMED.**